IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

HELLS CANYON PRESERVATION
COUNCIL and OREGON NATURAL
DESERT ASSOCIATION,
          Plaintiffs,

                                  3:11-cv-00023-PK

                                  FINDINGS AND
v.                               RECOMMENDATION

KENT CONNAUGHTON, Regional Forester,
Region 6, and U.S. FOREST SERVICE,
          Defendants,

PAT AND ANNA SULLIVAN, *et al.*
          Defendant-Intervenors

PAPAK, Magistrate Judge:

      Plaintiffs Hells Canyon Preservation Council ("HCPC") and Oregon Natural Desert

Association ("ONDA") bring this action against Kent Connaughton, the regional forester for

Region 6, and the U.S. Forest Service (collectively "Forest Service") challenging the Forest

Service's reauthorization of livestock grazing permits for a number of allotments on federal lands

under a categorical exclusion that relieved the Forest Service of its obligation to engage in the

environmental analysis otherwise required by the National Environmental Policy Act (NEPA).

Plaintiffs allege that the grazing reauthorizations violate a Congressional 2005 appropriations

Page 1- FINDINGS AND RECOMMENDATION

rider, Pub. L. 108-447, §339, (the "rider") which permits use of a categorical exclusion only

under certain limited circumstances.  Plaintiffs also allege that where the reauthorizations

violated the rider, they violate NEPA, 42 U.S.C. § 4321 *et seq.*, because they occurred without

the requisite NEPA environmental analyses.  This court previously granted a motion to intervene

(#48) by many of the grazing permittees ("intervenors").  Now before the court are cross motions

for summary judgment by plaintiffs (#83), the Forest Service (#107), and the intervenors (#103).

For the reasons described below, all three motions should be granted in part and denied in part.

## BACKGROUND

I.      **The Rider**

Grazing permits on Forest Service lands in the West generally last 10 years.  36

C.F.R. § 222.3(c).  In the late 1990s, because a large number of  permits were expiring before

NEPA analyses could be conducted, Congress passed a series of appropriation riders allowing

completion of NEPA analyses after the permits were reauthorized.   The backlog for NEPA

analyses on renewed permits continued to grow, and in a 2005 fiscal year appropriations bill

Congress passed a rider allowing the Forest Service grazing authorizations in fiscal years 2005

through 2007 to be "categorically excluded" from NEPA-required environmental analyses if

three requirements were met.  FY 2005 Consolidated Appropriations Act, § 339 (Pub. L 108-

447).  The rider allowed use of a categorical exclusion if: "(1) the decision continues current

grazing management of the allotment; (2) monitoring indicates that current grazing management

is meeting, or satisfactorily moving toward, objectives in the land and resource management

plan, as determined by the Secretary [of Agriculture]; and (3) the decision is consistent with

agency policy concerning extraordinary circumstances." *Id.*  The rider also provided that only

Page 2- FINDINGS AND RECOMMENDATION

900 allotments could be categorically excluded in this manner.  Congress later extended the rider

for fiscal year 2008 and added the limitation that a categorical exclusion could not be used for

any allotment within a federally designated wilderness area.  FY 2008 Consolidated

Appropriations Act, § 421 (Pub. L. 110-161).

## II.        The Challenged Decisions

Plaintiffs challenge a number of the Forest Service's categorical exclusion (CE)

decisions reauthorizing grazing permits in two national forests in eastern Oregon.  First,

pertaining to Wallowa-Whitman National Forest in Northeast Oregon, plaintiffs challenge two

Upper Imnaha River CEs reauthorizing grazing on the Chalk Creek, Dunlap-Thorn, Snell Creek,

Blackmore, College Creek, Dunn Creek, Grizzly Ridge, and Keller allotments, comprising over

12,600 acres and the North Fork Burnt River CE reauthorizing grazing on the adjacent Alder

Springs, China Creek, and Snow Creek allotments, comprising over 47,000 acres.  Second, in the

Umatilla National Forest, plaintiffs challenge 13 CEs reauthorizing grazing on the Lucky Strike,

Klondike, Little Wall, Monument, Tamarack, Hardman, Yellow Jacket, Collins Butte, Thompson

Flat, Matlock, Ditch Creek, Texas Bar and Central Desolation allotments, collectively

comprising over 277,000 acres.  These reauthorizations generally permit livestock grazing in the

summer and fall months.

## LEGAL STANDARD

Where an agency has taken final action, a court may set aside that action under

§706(2)(A) of the APA if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law."  5 U.S.C. § 706(2)(A); *Marsh v. Oregon Natural Res. Council*, 490 U.S.

360, 377 (1989).  Review under the arbitrary and capricious standard is narrow, and courts give

deference to an agency's construction of a statutory provision it is charged with administering. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-43 (1983); *American Fed'n of Gov't Employees v. Fed. Labor Relations Auth.*, 204 F.3d 1272, 1274-75 (9th Cir. 2000). The reviewing court must determine whether the agency's decision was based on a consideration of the relevant factors or whether there has been a clear error of judgment. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43; *Hells Canyon Alliance v. United States Forest Serv.*, 227 F.3d 1170, 1177 (9th Cir. 2000). For example, the court may set aside a decision if the agency has relied on "factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [if it] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43; *Nw. Coal. for Alternatives to Pesticides (NCAP) v. U.S. EPA*, 544 F.3d 1043, 1047 (9th Cir. 2008).

Thus, the reviewing court's inquiry, though narrow, must be "searching and careful." *Ninilchik Traditional Council v. United States*, 227 F.3d 1186, 1194 (9th Cir. 2000) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)). Further, "[d]eference to an agency's technical expertise and experience is particularly warranted with respect to questions involving . . . scientific matters." *United States v. Alpine Land & Reservoir Co.*, 887 F.2d 207, 213 (9th Cir. 1989). However, the "presumption of agency expertise may be rebutted if its decisions, even though based on scientific expertise, are not reasoned." *Greenpeace v. Nat'l Marine Fisheries Serv.*, 80 F. Supp. 2d 1137, 1147 (W.D. Wash. 2000). Therefore, although the scope of review is narrow, the depth of review is substantial. *NW Coalition for*

Page 4- FINDINGS AND RECOMMENDATION

*Alternatives to Pesticides v. EPA*, 544 F.3d 1043, 1052, n.7 (9th Cir. 2008) ("'although data

interpretation and analysis are functions that often lie within an agency's realm of expertise, it is

our duty to review those functions to ascertain whether the agency's actions were complete,

reasoned, and adequately explained. The mere fact that an agency is operating in a field of its

expertise does not excuse us from our customary review responsibilities'") (quoting *Center for*

*Auto Safety v. Peck*, 751 F.2d 1336, 1373 (D.C.Cir.1985) (Wright, J., dissenting)).

      An agency's decision that an activity falls within a categorical exclusion is subject to

this same "arbitrary and capricious" standard of review.  *Sierra Club v. Bosworth*, 510 F.3d

1016, 1022 (9th Cir. 2007).  "When an agency decides to proceed with an action in the absence

of an EA or EIS, the agency must adequately explain its decision." *Alaska Ctr. For Envm't v.*

*U.S. Forest Serv.*, 189 F.3d 851, 859 (9th Cir.1999).

## DISCUSSION

      Plaintiffs challenge each CE for failure to satisfy both the second and third

requirements of the 2005 rider.  That is, plaintiffs assert that the Forest Service reauthorized

grazing permits even though monitoring data did not indicate current grazing management was

meeting or satisfactorily moving toward forest plan objectives and despite that current grazing

practices might have a significant environmental effect on one of the resource conditions

identified by the Forest Service's extraordinary circumstances policy.   Before analyzing each

CE, it is useful to set forth some universal characteristics of the court's analysis under the rider.

## I.      General Principles

### A.      Rider's Second Prong

      Regarding the analysis under the second requirement of the rider, the text of the rider

explicitly requires "monitoring" show that current grazing management is meeting or satisfactorily moving towards "objectives" in the relevant land and resource management plans. The National Forest Management Act ("NFMA") and its implementing regulations provide for forest planning and management through both broad, long-term Land and Resource Management Plans ("LRMP" or "Forest Plan") and individual, project level, site specific documents such as resource plans, grazing permits and contracts consistent with the Forest Plan. *Western Watershed*, 2012 WL 1094356, at *1; 16 U.S.C. §§1600-1604.  The Forest Plans at issue in this case are the Wallowa-Whitman National Forest Plan and the Umatilla National Forest Plan. WPOL1405-1819; UPOL3166-3578.[1]  Both Forest Plans were amended by PACFISH and INFISH Riparian Management Objectives ("RMOs") in 1995.  WPOL 2735; UPOL4306.  In addition, part of the Wallowa-Whitman National Forest is subject to the Hells Canyon National Recreation Area Comprehensive Management Plan ("CMP").  WPOL 4008-5800.

The two Forest Plans at issue set forth a variety of overlapping "objectives," "goals," "standards and guidelines,"and "direction."  In addition, the plans describe monitoring activities and outputs to be tracked during implementation to ensure that the Forest Service satisfies the objectives of the Forest Plan.  *See, e.g.,* WPOL 1566.  Take, for example, Wallowa-Whitman Forest Plan's many forms of guidance on the issue of rangeland management.  Under a section entitled "Forest Management Objectives and Resource Summaries" the plan states the following "Forest Management Objective and Resource Summary " for range vegetation:

---

[1] Citations in this format refer to portions of the revised administrative record (#111). The administrative record is divided by national forest and allotment and the record itself employs capital letter prefixes to uniquely identify subsets of the record.  For example, the "WPOL" prefix identifies documents pertaining to Wallowa-Whitman National Forest policy.

Range vegetation is managed at levels that meet the basic needs of the plants and soils, the forage needs for wildlife at management objective population levels and to provide forage for permitted domestic livestock.  Beginning plan outputs for permitted livestock AUMs [Annual Unit Months] will be 186,000 (current level). As allotment management plans (AMPS) are developed and implement the utilization standards adjustments on an allotment specific basis will be necessary. It is anticipated that filling of vacant allotments and management improvements resulting from the Forest Plan funding levels will offset downward adjustments to some degree. However until the actual AMPs are implemented the deviation from the planned output of 186,000 AUMs will not be known.

WPOL 1469.    The, with regards to "Range", the Forest Plan states the following "goal":

To manage range ecosystems to ensure that the basic needs of the forage and soil resources are met. To make available forage production above that needed for maintenance or improvement of the basic resources to wildlife within Management Objective levels and permitted domestic livestock under standards and guidelines that will assure continued maintenance or improvement of the resource.

WPOL 1516.

In furtherance of that goal, the Plan articulates a number of "Standards and Guidelines" relating to forage allocation, utilization standards, and allocation management planning, such as "[a]llocate forage resources on an allotment and/or management area specific basis to meet the basic plant and soils needs as the first priority" and "[a]pply utilization standards to all management areas . . . ." WPOL 1516-1517.  There are also several monitoring provisions in the plan relating to rangeland, such as: monitoring range outputs in Animal Unit Months to ensure forage permitted for livestock and wildlife is within constraints imposed by basic plant and soil needs by reviewing annual grazing reports and permit transactions, with results reported every five years; monitoring forage utilization to assure range use standards and guidelines are correctly implemented by sampling at least 10% of allotments annually for range forage utilization, again reporting results every five years; and monitoring vegetative conditions

to assure that ranges have a satisfactory range condition or improving trend, reporting results

every five years.  WPOL1571, 1171.

Plaintiffs take a broad view of the rider language, arguing that the term "objectives"

also encompasses standards and guidelines expressed in Forest Plans, such that the Forest

Service must also demonstrate satisfactory progress with Forest Plan standards and guidelines to

satisfy the rider's second prong.  Similarly, plaintiffs contend that the "monitoring" referenced by

the rider is precisely the monitoring specified in the Forest Plans themselves.  Plaintiffs take the

position that the Forest Service must demonstrate progress towards Forest Plan objectives by

using the monitoring required in the Forest Plans or otherwise explain why alternative

monitoring data is a reliable substitute.  The Forest Service and intervenors, by contrast, argue

that because the rider specifically mentions "objectives" – not standards and guidelines– and

because the Congressional intent of the rider was to decrease the burden of environmental review

for the Department of Agriculture, the Forest Service can use attainment of some standards and

guidelines to show it is making progress towards Forest Plan objectives, even without necessarily

meeting *all* Forest Plan standards and guidelines.[2]  Likewise, defendants and intervenors argue

that the court should defer to Forest Service's technical expertise in deciding which monitoring

methods to employ to show progress toward Forest Plan objectives, even if the Forest Service

deviated from the monitoring regimes established by the Forest Plans.

_____

[2] Indeed, Forest Service CE decision memos express that position, noting that "Standards and guidelines promote the attainment of goals and objectives within the Forest Plan" and selecting certain standards and guidelines for "detailed analysis" that "provide critical information as to whether the continuation of current management meets [the second prong of the rider.]"  *See, e.g.*, UIN 7533.

The proper approach, I believe, is somewhere between the parties' positions.  As Judge Hamilton explained recently in addressing a similar challenge to Forest Service CEs under the rider,  "[i]n determining whether the Forest Service adequately relied on evidence showing that current grazing on the [allottment] was . . . meeting or satisfactorily moving towards LRMP objectives, the court's task is to review the record with respect to each area, and determine whether the [] CE adequately explained the Forest Service's decision, and whether the agency's decision is supported by evidence in the record."  *Western Wathersheds*, 2012 WL 1094356, at *7.   Judge Hamilton conducted this analysis in four steps.  First, she grouped her analysis into broadly drawn resource areas, such as "soil/plant diversity/rangeland objectives," and articulated the "LRMP objectives . . . in these areas," including not only objectives, but also forest management goals, projected outputs, standards and guidelines for forest management. *Id.* Second, she reviewed the monitoring and evaluation requirements described in the Forest Plan, noting the specific monitoring techniques and frequency with which they were to be conducted. *Id.* at *8.  Third, she described what monitoring actually occurred and noted areas where the plaintiffs deemed monitoring to be deficient.  Finally, she determined whether the Forest Service adequately supported the conclusions reached in its CE based on monitoring data "sanctioned by the [Forest Plan] and thus tailored to meet the objectives set forth therein."  *Id.* at *9.

This court discerns several general principles from Judge Hamilton's analyses of the Forest Service's compliance with the rider's second prong in *Western Watersheds*.   The court must give substantial deference to the Forest Service's interpretation of its own Forest Plan, particularly in the decisions it made regarding which monitoring techniques are useful in demonstrating progress towards Forest Plan objectives.   *Id.* at *8 (citing *Forest Guardians v.*

*U.S. Forest Serv.*, 329 F.3d 1089, 1097, 1099 (9th Cir. 2003)).   However, where the Forest

Service fails to employ monitoring techniques required by a Forest Plan and instead relies on a

different monitoring measure as a proxy to demonstrate progress towards the Forest Plan

objective, the record must include "empirical" evidence to support the use of that proxy measure

to monitor the particular resource.  *Id.* at *10-11, 17 (deferring to Forest Service's use of annual

forage utilization measures to monitor riparian objectives where Forest Service submitted

"empirical studies and analysis to that effect," but refusing to defer to Forest Service's reliance

on residual dry matter measurement as a surrogate for condition and trend studies required by

Forest Plan in part because the Forest Service did not provide empirical research supporting that

substitution).  And even if the record justifies use of a surrogate measure, that measure should

provide adequate proof of progress towards Forest Plan objectives on each allotment.  *Id.* at *17.

("significantly, it is not clear that RDM measurements were, in fact, used in order to monitor all

four allotments . . .  defendant's data reflects that RDM measurements were used in conjunction

with stubble height measurements, and that not all allotments were even complying with all

utilization standards.")

         Moreover, although the Forest Service may not rely exclusively on "stale"

monitoring information dating from decades before the challenged decision, older data in

conjunction with newer information can suffice.  *Id.* at *9,11 (citing *N. Plains Res. Council, Inc.*

*v. Surface Transp. Bd.*, 668 F.3d 1067, 1086 (9th Cir. 2011)).  Further, the Forest Service

provides adequate explanation for its conclusions in a CE if it supports those conclusions with

"reliable studies and data" and "adequately explain[s] the reasons why it consider[s] the

underlying evidence reliable."  *Id.* at *9 (citing *N. Plains Res. Council*, 668 F.3d at 1075).  By

Page 10- FINDINGS AND RECOMMENDATION

contrast, where the Forest Service fails to "provide the underlying data upon which its experts

relied" in reaching its ultimate conclusions, those conclusions are arbitrary and capricious. *Id.* at

*19, 20 (citing *Western Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 493 (9th Cir. 2011)).

### B.    Rider's Third Prong

The third prong of the rider requires than the agency's "decision is consistent with

agency policy concerning extraordinary circumstances." FY 2005 Consolidated Appropriations

Act, § 339 (Pub. L 108-447).  The Forest Service's policy on extraordinary circumstances, set

forth in the Forest Service Handbook, requires the Forest Service to determine whether certain

resource conditions are present in the action area as the first step in ascertaining whether

extraordinary circumstances exist.  *See* Forest Service Handbook ("FSH") 1909.15 § 31.2;

WPOL7508-7509.  These resource conditions include:

> 1) federally listed threatened or endangered species or designated critical habitat,
> species proposed for federal listing or proposed critical habitat, or Forest Service
> sensitive species; 2) flood plains, wetlands, or municipal watersheds; 3)
> Congressionally designated areas, such as wilderness, wilderness study areas, or
> national recreation areas; 4) inventoried roadless areas; 5) research natural  areas; 6)
> American Indian and Alaska Native religious or cultural sites; or 7) archaeological
> sites, or historic properties or areas.

*Id.*; 36 C.F.R. § 220.6(b).  If any of these resource conditions are present, the Forest Service must

then assess the degree of potential effect of the proposed action on the resource conditions.  *See*

*id.*  "It is the existence of a cause-effect relationship between a proposed action and the potential

effect on these resource conditions, and if such a relationship exists, the degree of the potential

effect of a proposed action on these resource conditions that determines whether extraordinary

circumstances exist." *Id.*; 36 C.F.R. § 220.6(b)(2).  "If the degree of potential effect raises

uncertainty over its significance, then an extraordinary circumstance exists precluding use of

Page 11- FINDINGS AND RECOMMENDATION

categorical exclusion." *Id.* Thus, if during scoping the Forest Service determines that it is "uncertain whether the proposed action may have a significant effect on the environment," an environmental assessment should be prepared, while an environmental impact statement should be prepared if "the proposed action may have a significant environmental effect." 36 C.F.R. § 220.6(c).

One initial point of contention between the parties is whether the rider's third prong also requires the Forest Service to consider whether the effects of a categorical exclusion, in combination with the *cumulative effects* of past, present, and future related actions, might also be significant. Plaintiffs argue that one of the "significant" environmental effects the Forest Service must consider during scoping is a cumulative impact. *See* 40 C.F.R. § 1507.27(b)(7) (CEQ regulations defining "significantly" in the NEPA context require analysis of, among other things, "whether the action is related to other actions with individually insignificant but cumulatively significant impacts"). Thus, plaintiffs insist, even application of an established categorical exclusion requires consideration of cumulative effects. *See Citizens for Better Forestry v. U.S. Dep't of Agric.*, 481 F. Supp. 2d 1059, 1089 (N.D. Cal. 2007) (holding that use of a CE was inappropriate in part because the proposed action "may be related to other action which has individually insignificant, but cumulatively significant impacts" and citing 40 C.F.R. § 1508.27(b)). Plaintiffs also contend that a cumulative effects analysis must "contain a useful analysis of the cumulative impacts of past, present, and future projects, which requires discussion of how future projects together with the proposed ... project will affect the environment." *Sierra Club v. Bosworth*, 510 F.3d 1016, 1027–1028 (9th Cir. 2007) (internal quotations and citations omitted).

Page 12- FINDINGS AND RECOMMENDATION

Defendants concede that cumulative impacts analysis must take place before first *establishing* a categorical exclusion for a type of actions, but contend that cumulative impacts need not be considered later when *applying* the categorical exclusion to a particular proposed action.  *See Sequoia Forestkeeper v. U.S. Forest Serv.*, 2010 WL 5059621, at *17 (E.D. Cal. Dec. 3, 2010) ("Categorical exclusions are actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in NEPA procedures adopted by a Federal agency. By definition, then a categorical exclusion does not create a significant environmental effect; consequently, the cumulative effects analysis required by an environment assessment need not be performed [when applying a categorical exclusion]. That assessment has already been conducted as part of the creation of the exclusion.").  The Forest Service also contends that cumulative impacts need not be considered unless specifically enumerated in the Forest Service's extraordinary circumstances policy.  *See Ctr. for Biological Diversity v. Salazar*, 791 F. Supp. 2d 687, 702 (D. Ariz. 2011) (failure to provide reasoned basis for finding no significant cumulative impacts from permit issuance is arbitrary and capricious where Bureau of Land Management's NEPA handbook lists "cumulative impacts" as one of resource conditions that could constitute an extraordinary circumstance). Alternatively, the Forest Service argues that the scoping done by the Forest Service before use of a categorical exclusion does not mandate the full-fledged cumulative impacts analysis that plaintiffs insist is required.

Again, I take a middle ground between the parties' positions.  Plaintiffs are correct that the Forest Service's scoping obligation indirectly requires consideration of potential "cumulatively significant impacts," among other things, in determining the significance of the

proposed action's effect on resource conditions listed in the extraordinary circumstances policy.
*See* 40 C.F.R. § 1507.27(b)(7).  Indeed, the Forest Service's handbook recognizes as much.  FSH
1909.15 § 31.3; WPOL7506 (noting that scoping for a proposed action that appears to be
categorically excluded should "reveal any past, present, or reasonably foreseeable future actions
with the potential to create uncertainty over the significance of cumulative effects.")  But, that
consideration of cumulative impacts in scoping is different, and less exhaustive, than the
cumulative impacts analysis required either in establishing a CE initially or conducting an EA or
EIS.  *See Sierra Club*, 510 F.3d at 1027–1028 (requiring the same intensity of cumulative
impacts analysis in creation of CE as in conducting an EIS);  *Muckleshoot Indian Tribe v. U.S.
Forest Serv.*, 177 F.3d 800, 809–10 (9th Cir. 1999) (assessment of cumulative impacts in EIS
must adequately catalogue the relevant projects in the area, include a useful and detailed analysis
of cumulative impacts of past, present, and future projects, and discuss how future projects
together with the proposed action will affect the environment).   Thus, to the extent that a listed
resource condition is present and the Forest Service's scoping in this case revealed any "past,
present, or reasonably foreseeable future actions with the potential to create uncertainty over the
significance of cumulative effects" on that resource condition, the Forest Service was bound to
provide a reasoned basis for finding that the cumulative effects would be insignificant.  *See
California v. Norton*, 311 F.3d 1162, 1177 (9th Cir. 2002) (where there is "substantial evidence
in the record that exceptions to the categorical exclusion may apply, the agency must at the very
least explain why the action does not fall within one of the exceptions.")

I turn now to an analysis of the challenged CE decisions.

## II.       Wallowa-Whitman National Forest

**A.**          **Upper Imnaha CE– Chalk Creek, Dunlap-Thorn, and Snell Creek**,

**Blackmore, College Creek, Dunn Creek, Grizzly Ridge, and Keeler**

**Allotments**

On September 26, 2008, the Forest Service issued a decision memo categorically

excluding from NEPA analysis the reauthorization of grazing on the Chalk Creek, Dunlap-Thorn,

and Snell Creek allotments.  On September 30, 2008, the Forest Service issued a similar decision

memo categorically excluding the reauthorization of grazing on the Blackmore, College Creek,

Dunn Creek, Grizzly Ridge, and Keeler allotments.  The majority of these allotments are subject

to both the Wallowa-Whitman Forest Plan and the Hell's Canyon National Recreation Area

CMP.  Some portion of the Chalk Creek and Dunlap-Thorn allotments are also subject to the

Imnaha Wild and Scenic River Management Plan.  Although issued as two separate CEs, the

parties conduct a unified analysis of the rider's applicability to all eight Upper Imnaha

allotments.  I do the same.

**1.**          **Second Prong**

**a.**          **Rangeland**

In the area of rangeland management, the CMP and Forest Plan set several

objectives.[3]  First, plaintiffs rely on the CMP objective providing that impacts associated with

---

[3]  Because of the size of the administrative record and the complexity of this case, the
court relies in part on charts jointly prepared by the parties at the request of the court that
summarize applicable objectives, standards, and monitoring provisions.  (#141,146.)
    The Forest Plan objective provides that range vegetation be managed at levels that meet
the basic needs of the plants and soils, the forage needs for wildlife at management objective
population levels, and to provide forage for permitted domestic livestock.  WPOL1469.
Meanwhile, the CMP objectives require the Forest Service to manage grassland vegetation to
ensure continued ecological function and sustainability of native ecosystems, maintain and/or

grazing be evaluated annually "in relation to established standards and thresholds." WPOL4924. In turn, CMP standards require management to either maintain or move rangeland towards "satisfactory condition." WPOL4925-4926. The standards define satisfactory condition by reference to "minimum condition and trend standards" showing that rangeland vegetation in upland and riparian habitats, soils, and riparian hardwood are in all in "mid-seral ecological status with an upward trend or higher condition." *Id.* Mid-seral ecological status is defined as "range condition of fair with an upward trend." *Id.* Plaintiffs also point out that CMP standards require implementation of Forest Plan maximum annual forage utilization standards for uplands areas. WPOL4927.

Defendants and intervenors argue that while the Forest Service must annually evaluate the impacts of grazing, it need not follow any specific form of monitoring and that the monitoring conducted here was adequate to show progress towards the overall rangeland objectives of the CMP and Forest Plan. Defendants and intervenors refer to condition and trend data at eight sites for forage and soil, UIN7418, forage utilization data meeting standards between 1998 and 2007, UIN7424-7425, the Interpreting Indicators of Rangeland Health qualitative assessment, UIN7426-7427, soil stability testing, UIR 7428, cover/frequency ecoplots on two sites, UIN7428-7429, and other relevant evaluations.[4]

_____

restore the ecological status of grassland communities to their potential natural community (PNC) recognizing their historic range of variability (HRV), evaluate annual impacts associated with livestock grazing in relation to established standards and thresholds, and manage soil surface conditions consistent with late-seral status depending on the PNC. WPOL4924, WPOL4961.

[4] These include ecoplot data and photo monitoring, UIN6305-6368, 6370-6443, botanical inventories, UIN7283, a biological assessment of plant species, UIN7447, soil stability surveys

Plaintiffs, however, identify several deficiencies with these justifications.  Starting with condition and trend data, plaintiffs contend that data was read only once in 40 years for several allotments; the data is over 40 years old for the Grizzly Ridge allotment; there is no data altogether for the College Creek allotment; the Blackmore allotment has no data prior to 2008 to establish any trend; data for the Dunn Creek allotment shows vegetation declined from poor to very poor; vegetation remained poor in one of two sites in the Dunlap-Thorn allotment; and forage in all but two other allotments was not satisfactory according to CMP standards requiring at least a rating of fair with an upward trend. UIN7418.  Plaintiffs further contend that forage utilization data for upland areas is sporadic and nearly a decade old for most allotments. UIN6944, 7425.  Plaintiffs also argue that the cover/frequency ecoplot analysis is, by its own admission, insufficient to support a finding that conditions were improving. UIN428-7429.

Overall, I find that the Forest Service adequately supported its conclusion that monitoring data demonstrated satisfactory progress towards rangeland objectives.  *Western Watersheds* teaches that the Forest Service has considerable latitude in selecting which monitoring data to rely upon to satisfy the rider's second prong, so long as they are measures called for by the Forest Plan to assess the relevant objective.   Here, where the CMP specifically called for condition and trend monitoring, the Forest Service presented some relatively current, long-term condition and trend data for all but the Grizzly Ridge allotment (only measured in 1964) and the Blackmore allotment (only read in 2008).[5]  UIN 7418.  The Grizzly Ridge

UIN7455- 7524, 7428, and a Water and Soil Field Review, UIN7002- 7240.

[5] Although no data appears for the College Creek allotment, the Forest Service notes that conditions there were similar to those at one of the Snell allotment sites due to their proximity.

Page 17- FINDINGS AND RECOMMENDATION

allotment showed satisfactory short-term forage utilization in 2007 and 2008, even in upland

areas that plaintiff contends were not measured, and as does the Blackmore allotment in 2008.[6]

UIN7424, 7425.  The condition and trend forage data for the Dunlap-Thorn and Dunn Creek

allotments admittedly look grim, with one of two sites in Dunlap-Thorn continuing to receive a

"poor" rating with a static trend and Dunn Creek receiving  a "very poor" rating with a

downward trend.  UIN 7418.   But other measures of rangeland health for those allotments were

acceptable, such as soil stability and the qualitative Interpreting Indicators of Rangeland Health.

While I agree with plaintiffs that the forage condition and trend data for most sites monitored did

not technically qualify as "satisfactory" according to the CMP standard's definition of that term

because they were in "fair" condition with a static trend instead of upward trend, this is not a

fatal flaw.  The Forest Service concluded the allotments were moving towards applicable

rangeland objectives based on the *totality* of monitoring, including  forage and soil condition and

trend data, annual forage utilization data, Interpreting Indicators of Rangeland Health, soil

stability tests and reconnaissance.  UIN 7419.  In sum, I defer to the Forest Service overall

_____

UIN 7418.

    [6] Plaintiffs challenge the reliability of forage utilization monitoring because it was
performed infrequently, noting that the Forest Plan calls for assessment of forage utilization
"continuously" with reports every five years, so that monitoring may determine compliance with
annual use standards for grasses in upland and riparian areas.  WPOL1516-1518.   Intervenors
argue that the Forest Service is not required to collect utilization data for every allotment every
year, citing the rangeland analysis apparently assuming as much without clear explanation.
UIN7424.  Even if the Forest Service measured utilization less frequently than the Forest Plan
methodology required, I cannot conclude that the utilization data is completely unreliable as an
indicator of rangeland health.  Moreover, the utilization data the Forest Service did collect
uniformly shows compliance with annual utilization standards, consistent with the Forest
Service's conclusion.

conclusion that the allotments were in "satisfactory condition" based on the combination of

rangeland monitoring data collected.  UIN7536, 7566.

**b.**      **Unique Species, Habitats, and Ecosystems**

Plaintiffs next allege that the Forest Service failed to produce monitoring that

demonstrated compliance with or satisfactory progress towards objectives related to unique

species, habitats, and ecosystems, specifically biological soil crusts, and springs, seeps, and other

wetlands.

**(1)**      **Biological Soil Crusts**

Regarding biological soil crusts, the CMP includes the following objectives:

Conduct management activities in a manner that maintains, enhances, and facilitates
restoration of healthy biological soil crust communities.

\*\*\*

Develop, through project level planning, management objectives that include desired
levels of biological soil crust development based on site capability and rangeland
health indicators of site stability and nutrient cycling. Use the biological soil crust
evaluation process developed by the BLM-Idaho Office for this evaluation until a
HCNRA specific evaluation process is developed.

WPOL4944-4945.   To achieve that objective, the CMP provides the following standard: "Where

human-caused activities are found to be creating unacceptable impacts to biological soil crusts,

implement changes in management to reduce or eliminate the impacts. These may include

changes in the timing, intensity, frequency, or duration of the activity." WPOL4945.

As an initial matter, it is important to understand that biological soil crusts in the

Upper Imnaha allotments have long been compromised by human activities. The Forest Service's

own Water and Soil Field Review from September 2008 recognizes that the parts of the Upper

Imnaha allotments with biological soil crusts have passed a sort of biological tipping point.

UIN7007-7010.  For example, the lower benches, footslopes and colluvial talus cones along the

Imnaha River historically contained mostly Idaho fescue and bluebunch wheatgrass.  But past

logging, fire and grazing practices caused erosion and a shift away from bunchgrass to early seral

perennial vegetation.  Along with this change, most of the biological soil crusts disappeared.

UIN7009 ("Gone are moss and biological soil crusts that once occupied the interspaces between

the bunchgrass; the moss coupled with the loam soil and rock provided slope stability. Only

isolated patches of moss remain in more isolated areas (amongst rock under bunchgrass

clumps).").  Restoring that historical plant community is "nearly impossible without time, money

and physical alteration of the current landscape." UIN7010.  Consequently, the Forest Service

developed a new "desired condition" based on a "new definition of the potential plant

community and recognition that historic soil erosion is irreversible . . . ." *Id.*  With respect to

biological soil crusts in particular, the Forest Service seeks to achieve the desired condition by

"[e]ncouraging the establishment of biological soil crusts in areas of low animal traffic" in the

lower benches, footslopes and colluvial talus cones areas, and "[e]ncouraging the establishment

of biological soil crusts" in rimrock and steep interslope areas.  UIN7008, 7010.

        Defendants and intervenors argue that monitoring showed that the Forest Service's

deferred and rotational grazing practices demonstrated compliance with CMP objectives by

"maintaining" biological soil crusts.  First, they point to a 2008 Upper Imnaha Watershed Report

based on field observations, photographs, and completion of an Interpreting Indicators of

Rangeland Health (IIRH) Assessment for each allotment.[7]  UIN0042-0043.  The 2008 Watershed

_____

        [7] The report, however, specifically notes that IIRH data was not intended to provide trend
or baseline monitoring data.  UIN0043.

Report states that biological soil crusts, i.e. moss, was present in most of the allotments, but "occurred in protected places such as amongst rock outcrops and surface rock." UIR0057. When not protected, it was "dry and moved easily underfoot." *Id.* The sole exception was the Dunn Creek allotment, where moss was more prevalent and robust, appearing "between the plants on bare ground and along the edges of the historic terraces." *Id.* The report observed that grazing during times when soil was moist, such as early to mid-winter, had much less impact on soil crusts than during other periods, where grazing can break dry and brittle soil crusts. *Id.* The report stated that "site conditions and current vegetation communities" were being maintained, although "[s]pring use of the allotments by cattle, elk, or deer will continue to trample and shear moist loam soils and biological crusts." UIN0064. Second, defendants and intervenors cite a Forest Plan Consistency Review referring to the CMP's biological soil crust objective and stating that "[t]he best time to graze for soil crust management would be early to mid winter, however, with deferred and rotational grazing schedules the crusts will continue to be maintained." UIN 7306.

Plaintiffs dispute that the deferred and rotating grazing schedules authorized would actually maintain the current status of biological soil crusts, since the Consistency Review cites no evidence for that proposition and even the authorized rotational grazing schedules includes spring grazing, a period when soil crusts are fragile. Given the Watershed Report's observation suggesting that spring grazing damages biological soil crusts and the dearth of explanation for why the current level of spring grazing still maintained the current status of soil crusts, the Forest Service's justification is suspect.

But even assuming the Forest Service adequately demonstrated that the modified

Page 21- FINDINGS AND RECOMMENDATION

grazing schedule maintained the biological soil crusts in their admittedly degraded condition, plaintiffs argue that the Forest Service failed to demonstrate any progress towards the other mandatory aspects of the CMP objective.  WPOL4944 ("Conduct management activities in a manner that *maintains, enhances, and facilitates restoration* of healthy biological soil crust communities.") (emphasis added).  I agree.  With the exception of the Watershed Report's isolated description of mosses in the Dunn Creek allotment, the defendants and intervenors cite no monitoring data or other observations showing that management practices are affirmatively improving the health of existing biological soil crusts or facilitating restoration of such communities, or are making progress towards the Forest Service's "desired condition" of "encouraging establishment of biological soil crusts."  In sum, if the CMP objective had required only maintenance of current conditions, the Forest Service's monitoring might have sufficed.  But the CMP requires proactive restoration and the Forest Service does not even purport to demonstrate progress towards that goal.  Accordingly, the CEs fail to satisfy the second prong of the rider and therefore violates NEPA requirements. *Western Watersheds*, 2012 WL 1094356, at *18 (citing *Bering Strait Citizens for Responsible Dev. v. U.S. Army Corp of Eng'rs*, 524 F.3d 938, 947 (9th Cir. 2008)).

### (2)        Springs, Seeps, and Other Wetlands

The CMP also contains the objective to "[e]nsure management activities provide for protection, retention, or enhancement of water quality and quantity from natural springs, seeps and other wetlands." WPOL4986.  For developed springs, a CMP standard requires the Forest Service to "ensure that the water source is protected from trampling damage, the trough or other

use point is located away from the spring and watercourse, and that overflow water remains at the spring source (use of float values) or is transported back to the natural channel." WPOL4986. For undeveloped springs, a CMP guideline provides that "springs impacted by livestock, big game, recreationists, etc. to the degree that their functionality is being impaired, should be protected or managed to restore functionality" through "fencing, placement of large woody debris, or restriction of activities as needed." WPOL4986.  The intervenors argue that monitoring shows the vast majority of springs and wetlands in the allotments are in good condition, again citing the findings of the 2008 Water and Soil Field Review, while the plaintiffs contend that the same report actually shows many of these springs to be adversely affected by livestock grazing.

While defendants and intervenors are correct that many wetlands were in good condition, the Water and Soil Field Review shows that most allotments had springs showing signs of trampling and other impacts from cattle and large game or had springs that were not examined, especially in the Snell and Chalk Creek allotments, which were most obviously affected by cattle.  UIN7012 (Blackmore allotment) (spring fed intermittent stream was in good condition; no other springs or wetland observed); UIN7016 (Dunn Creek allotment) (spring fed intermittent stream in good condition, but "[o]ne spring is known to have moderate levels of trampling damage"); UIN7020-7021 (College Creek allotment) ("past trailing in the valley bottom and the north sideslopes show hoof shear and trampling impacts" but animals do not appear to be currently trailing up and down the valley; three stream crossings stable; one moist spring with trampling likely by elk with no channelization); UIN7024-7025 (Grizzly Ridge allotment) (ephemeral draw, crossings, and one filled in pond are stable; another pond shows trampling and lack of vegetation; ephemeral springs show trampling that is not enlarging because

Page 23- FINDINGS AND RECOMMENDATION

shrubs limit animal movement); UIN7026-7028 (Snell allotment) (trailing in the valley bottom

and the north sideslopes show hoof shear and trampling impacts; major trail leading up the

intermittent drainage from the developed spring introducing sediment into the intermittent

channel during spring flows; crossings stable; maintenance needed at a developed spring because

malfunctioning overflow is causing water to pond at the base of the trough; area heavily trampled

with off-site sediment movement, with impact by cattle, elk, deer, bear and other wildlife);

UIN7037-7038 (Keeler allotment) (crossing stable; domestic spring was not surveyed);

UIN7041-7042 (Dunlop-Thorn allotment) (two creeks show no impacts; "Dunlap Creek riparian

area has both crossings and trailing with direct sediment contribution to Dunlap Creek"; several

water developments identified but either were not located or inaccessible and may require

maintenance and hardening of the site to reduce erosion trampling and hoof shear impacts

depending on the condition and location); UIN7046-7048 (Chalk allotment) (one of two

drainages heavily trampled; four out of seven water developments with at least moderate

disturbances from cattle).

   With respect to Snell and Chalk Creek, defendants argue that mitigation efforts

satisfy the rider's second prong requiring current grazing management to meet or move towards

CMP objectives.  Indeed, the Forest Service's 2008 Watershed Report references mitigation

measures such developing a water development/trough maintenance plan for Snell and Chalk

Creek.  UIR0041–0042.  The Report also recommends changing grazing use and developing a

riparian and stream channel use plan in the Dunlap-Thorn allotment, as well as completing a

water development inventory and developing a hilltop spring and wetland protection plan for

each allotment. UIN0041.  But these mitigation measures appear to be only recommendations for

plans that had not yet been drafted, let alone implemented or monitored.[8]  UIR0042.

Plaintiffs argue that the Forest Service's reliance on intended future mitigation measures is inadequate for two reasons.  First, they say, unimplemented mitigation plans cannot be considered "current grazing management" referenced by the rider's second prong.  FY 2005 Consolidated Appropriations Act,§ 339 (Pub. L 108-447) ("(2)monitoring indicates that *current grazing management* is meeting, or satisfactorily moving toward, objectives in the land and resource management plan, as determined by the Secretary") (emphasis added).  Although the rider does not define "current grazing management," Forest Service guidance establishes that "current management" refers only to "current management actions being implemented."  FSH 2209.13 § 92.31.  Intervenors, however, argue that even proposed but unimplemented mitigation measures constitute "current management" because, where further action is needed to satisfy the rider, the Forest Service Project Consistency Review describes how the future mitigation will be incorporated into the allotment's management. (Intervenor's Reply Br., #127, at 25-26 n. 17).  Regarding watershed management, the Consistency Review states that "[c]urrent management includes the use of BMPs [Best Management Practices] and mitigations."  UIN7302.  Proposed future mitigation measures can sometimes compensate for adverse environmental affects.  *Sierra Club v. Bosworth*, 510 F.3d 1016, 1029 (9th Cir. 2007).  Although the Consistency Review hardly makes the connection in detail, the court can infer that the BMPs and mitigations referenced are those proposed in the Watershed Report.  Thus, at the time of the CEs, the Forest

---

[8]  The report also recommends implementing Best Management Practices for project planning and grazing permit administration, as well as monitoring to ensure implementation and effectiveness of these practices.  UIN0041-0042.

Service's current management included those proposed mitigation measures.

Second, plaintiffs argue that even if proposed future mitigations may be acceptable in theory, the Forest Service's proposed mitigations in this case fail to support a categorical exclusion from NEPA analysis. In the somewhat analogous context of mitigation measures described in an Environmental Impact Statement (EIS) under NEPA[9], the Ninth Circuit holds that proposed mitigation measures must be "developed to a reasonable degree" and supported by analytical data. *Sierra Club v. Bosworth*, 510 F.3d 1016, 1029 (9th Cir. 2007) (citing *Nat'l Parks & Conservation Ass'n*, 241 F.3d at 734; *Okanogan Highlands Alliance v. Williams*, 236 F.3d 468, 473-75 (9th Cir. 2000)). That is, "a mitigation plan need not be legally enforceable, funded or even in final form to comply with NEPA's procedural requirements." *Okanogan Highlands Alliance*, 236 F.3d at 473. However, a "perfunctory description" or "mere listing" of mitigating measures is inadequate to satisfy NEPA's requirements. *Id.* (quoting *Neighbors of Cuddy Mountain v. United States Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998); *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1151 (9th Cir. 1998)).

Here, I agree with plaintiffs that the Forest Service's wetland and springs mitigation measures are not sufficiently developed to justify a categorical exclusion. A plan to make a

---

[9] While an EIS must contain "a reasonably complete discussion of possible mitigation measures," *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989), "actions taken under a categorical exclusion do not require mitigation measures." *Sierra Club v. Bosworth*, 510 F.3d 1016, 1029 (9th Cir. 2007). It stands to reason, however, that where a categorical exclusion relies on mitigation measures to avoid a full-blown NEPA analysis, those mitigation measures should be as thoroughly explained as mitigation measures described in an EIS itself. Indeed, several Ninth Circuit cases evaluating whether categorical exclusions properly rely on mitigation measures invoke the standard for mitigation measures in an EIS. *See Bosworth*, 510 F.3d at 1029; *Alaska Ctr. For Env't v. U.S. Forest Serv.*, 189 F.3d 851, 859–860 (9th Cir. 1999); *Jones v. Gordon*, 792 F.2d 821, 829 (9th Cir. 1986).

plan– what the Forest Service offered here– is substantially more inchoate than even a
perfunctory plan description or a mere listing of mitigation measures, both of which are
inadequate to satisfy NEPA's requirements.  Moreover, because the Forest Service did not even
produce an early version of the various mitigation plans it relied upon, there is no way for the
court to determine whether those plans proposed techniques supported by adequate analytical
data to demonstrate their effectiveness.  This oversight is particularly obvious in the context of
the CMP's emphasis on protecting springs.  The CMP standards and guidelines relating to
springs contemplate that mitigation measures such as building fences or barriers preventing
animals from accessing springs might demonstrate progress towards the CMP's objective.  Thus,
a Forest Service spring protection plan that included fencing around springs that showed signs of
trampling, for example, could have demonstrated progress towards the CMP objective for water
quality.  By contrast, a promise to create a spring protection plant, without further detail, cannot.

The cases cited by the Forest Service where mitigation efforts were sufficient to
justify a categorical exclusion are inapposite.  Those cases involved present implementation of
detailed mitigation measures, not single-line proposals for future, unspecific mitigation plans.
*See Alaska Ctr. For Env't v. U.S. Forest Serv.*, 189 F.3d 851, 859 (9th Cir. 1999) (upholding
issuance of a special use permit authorizing helicopter-guided skiing and hiking proper under
categorical exclusion, when permit included mitigation measures on flight path, operation times,
and noise reduction);  *Alliance for the Wild Rockies v. Tidwell*, 385 F. App'x 732, 734 (9th Cir.
2010) (upholding use of categorical exclusion to authorize harvest of diseased trees when Forest
Service took empirically supported measures to mitigate impact on a northern goshawk nest,
including creating a 40-acre no-activity zone around the nest and banned any logging activities

during months when goshawk young are born and raised).

Finally, I reject the Forest Service's suggestion that its mitigation plans are the type of adaptive mitigation management of which courts sometimes approve.  In *Theodore Roosevelt Conservation P'ship v. Salazar*, the D.C. Circuit recognized that an "adaptive management plan" to monitor the effects of a long-term natural gas drilling project and adapt mitigation measures to observed trends satisfied NEPA's mitigation requirements.  616 F.3d 497, 517 (D.C. Cir. 2010) ("Allowing adaptable mitigation measures is a responsible decision in light of the inherent uncertainty of environmental impacts").  *Salazar* makes clear that adaptive management is the proper tool to address future, unanticipated impacts from complex, long-term projects.  But here the Forest Service is faced with known damage wrought by livestock grazing.  More concrete tools than adapative management must be employed to mitigate these present effects before the Forest Service may rely on a categorical exception to NEPA requirements.

In sum, the Forest Service's failure to demonstrate that grazing management on the challenged Upper Imnaha allotments were at least satisfactorily moving towards the CMP objective for springs, seeps, and other wetlands constitutes yet another basis for finding that two Upper Imnaha CEs were arbitrary and capricious.

### c.        Riparian Areas and Water Quality

Plaintiffs refer broadly to a number of different objectives, goals, standards and guidelines from the Wallowa-Whitman Forest Plan and the HCNRA CMP that apply to riparian areas and water quality, including the PACFISH/INFISH Riparian Management Objectives

("RMOs") for stream channel conditions.[10]  Moreover, the Forest Service's Consistency Review

identifies two riparian objectives and two water quality objectives set forth in the CMP: focusing

restoration on human caused disturbances, managing lands to achieve watershed management

objectives in the Wallowa Count/Nez Perce Tribe Salmon Habitat Recovery Plan, maintaining or

improving water quality, and maintaining favorable conditions of streamflow for water quality.

UIN7307-7308.  The same document lists the Forest Plan goal: "to maintain and enhance the

unique and valuable characteristics of riparian areas to maintain or improve water quality,

streamflows, wildlife habitat, and fish habitat design; and to conduct all management activities in

all streamside management units to maintain or improve water quality and associated beneficial

uses in SMU Class and II streams." UIN7301.

      As an initial matter, I disagree with the plaintiffs that the Forest Service failed to

---------------------

     [10] PACFISH and INFISH are regional aquatic conservation strategies that amended
eastern Oregon forest plans in 1995 to further ensure protection of aquatic ecosystems and native
fish species.  WPOL2260-2664 (PACFISH), WPOL2711-2749 (INFISH).  PACFISH and
INFISH state riparian goals, which "establish an expectation of the characteristics of healthy
functioning watersheds, riparian areas, and associated fish habitats."  WPOL1393, 2732-2733.
PACFISH and INFISH also set forth supplemental Riparian Management Objectives ("RMOs")
to provide the criteria against which attainment or progress toward attainment of the riparian
goals is measured.  WPOL2393, 2733.   PACFISH and INFISH identify objectives for six
environmental features, which are good indicators of ecosystem health. WPOL2734.  The RMOs
are: (1) pool frequency (varying by channel width); (2) water temperature (no measurable
increase in maximum water temperature; max temperature below 64F within migration and
rearing habitats and below 60F within spawning habitats); (3) large woody debris (greater than
20 pieces per mile of greater than 12 inches in diameter and greater than 35 feet in length); (4)
bank stability (more than 80% stable); (5) lower bank angle (more than 75% of banks must have
an angle of less than 90 degrees); and (6) width/depth ratio (the mean wetted width divided by
mean depth must be under ten). WPOL2735, 2394.  PACFISH RMOs apply to streams in
watersheds with anadromous fish. Each of the RMOs must be met or exceeded before general
habitat conditions would be considered good for anadromous fish. WPOL2393. INFISH RMOs
apply to watersheds occupied by inland native fish. WPOL2734.

demonstrate progress towards the Imnaha Wild and Scenic River Management Plan aquatic habitat standard requiring that grazing "is consistent with the objectives of the individual river segments, protects and enhances the Outstandingly Remarkable values, and protects water quality." UIN4905.  The Plan also specifies that "[a]ll ground disturbing or vegetation disturbing activities within the [management zones] will be analyzed and designed to have no adverse impact on fish habitat or water quality."  UIN4908.  The Imnaha Wild and Scenic River Management Plan only applies to the Campbell pasture in the Chalk Creek allotment, which borders the Imnaha River, a PACFISH Category I channel.  UIN 7388.  The Forest Service's Biological Assessment observed that cattle access 150-200 feet of river bank, "with direct sediment input to the river occurring due to bank breakage and soil displacement from trampling . . . ."  UIN7388-7389.  However, the trampling occurs at only about four percent of the river bank, which is otherwise inaccessible. UIN7389.  Additionally, the sediment caused by cattle is likely not affecting the feeding or sheltering behavior of fish in the river because the amount of sediment is "negligible and discountable relative to the size of the river and its transport capacity," the river is at peak flow when sediment is entering the channel, and the effects of this sediment is no more than that caused by already existing upriver redistribution of sediment from past flooding.  UIN7389.  Also, while there is a small risk of livestock urinary or fecal waste entering the river, the chemical effects on water quality "would likely be undetectable in the river due to the dilution factor."  UIN7389.

Plaintiffs correctly note that the Biological Assessment mistakenly reported that forage use in the Campbell pasture had been in compliance with utilization standards based on monitoring "since 2000," when, in fact, monitoring had last occurred in 2000. UIN7385; UIN

7388.  But this minor error does not detract from the reasonable explanation given in the

Biological Assessment that the sediment contributed to the portion of the Imnaha river from

livestock trampling in the Campbell pasture would not have any impact on water quality and fish

habitat.  I conclude that the Forest Service provided adequate explanation for its conclusion that

current grazing was making satisfactory progress towards the Imnaha Wild and Scenic River

Management Plan standards.

Nevertheless, the Forest Service's reliance on the categorical exclusion was unjustified

for other reasons.  Defendants and intervenors argue that the Forest Service met its obligations

under the second prong of the rider with respect to Forest Plan riparian objectives by relying on

intermittent monitoring of residual stubble height from 1998-2007 meeting standards,

intermittent riparian utilization from 1998-2008 meeting standards, and site visits and

photographs showing that riparian conditions in the challenged allotments were in good

condition.  UIN7385, 7419, 7425, 6944, 0045-0049.   As described more thoroughly below in

relation to the North Fork Burnt River CE, I find that forage utilization monitoring, even when

combined with qualitative observations from site visits and photographs, cannot adequately

demonstrate progress towards RMOs.  On this basis alone the Forest Service's explanation is

inadequate.

The Forest Service also improperly relies on vague future mitigation measures.  In its

Consistency Review, the Forest Service lists proposed mitigation measures to demonstrate

progress towards other Forest Plan riparian and water quality objectives.  UIN7302, 7307-7308,

7312-7316.  These are the very same mitigations this court discussed above that are completely

lacking in concrete detail.  They therefore cannot satisfy the second prong of the rider requiring

Page 31- FINDINGS AND RECOMMENDATION

compliance with or satisfactory progress towards Forest Plan objectives.   For these additional

reasons, the Forest Service's conclusion that current grazing management is satisfactorily moving

towards or meeting riparian objectives is arbitrary and capricious.

### 2.    Third Prong

Plaintiffs identify several extraordinary circumstances present in the Upper Imnaha

allotments, for which they contend the Forest Service failed to explain why there was no

potential for significant environmental effects:  the congressionally designated HCRC; federally

designated critical habitat for listed fish and threatened fish species; congressionally designated

Imnaha Wild and Scenic River; seeps, springs, and other unique wetlands; and sensitive plant

species.

### a.    Congressionally Designated HCNRA

To explain why the effects of grazing were not significant on the HCNRA, the Forest

Service's decision memos for the Upper Imnaha CEs simply state that the Hells Canyon CMP

objectives, goals, standards, and guidelines were "addressed" in the Upper Imnaha Consistency

Review.  UIN 7538, 7567.  But, as I explained above, neither the Forest Service's Consistency

Review nor any other documentation identified by defendants or intervenors demonstrated that

current grazing management was meeting or moving towards CMP objectives for biological soil

crusts and seeps, springs, and wetlands.  As a result, I cannot find that the Forest Service's

reliance on its purported compliance with CMP objectives, standards, etc. was adequate

assurance that the HCNRA would suffer no potential significant environmental effects from the

continuation of grazing.

### b.    Congressionally Designated Wild and Scenic Imnaha River

Page 32- FINDINGS AND RECOMMENDATION

Although listed in the chart provided to the court after oral argument as an extraordinary circumstance, plaintiffs do not explicitly argue in briefing that the Wild and Scenic Imnaha River qualifies as a resource condition that must be addressed under the rider's third prong.  I therefore decline to evaluate the sufficiency of the Forest Service's explanation concerning effects of grazing on the portions of the Wild and Scenic river within the challenged allotments.

### c.     Designated Critical Habitat for Listed Fish and Threatened Fish Species

The Forest Service's extraordinary circumstances policy includes "federally listed threatened or endangered species or designated critical habitat, species proposed for federal listing or proposed critical habitat, or Forest Service sensitive species" on the resource conditions that could trigger full NEPA analysis. 36 C.F.R. §220.6(b).  Here, the Forest Service's CE decision memos recognize that federally threatened Snake River chinook, steelhead, and bulltrout are present in the Imnaha River near the Blackmore, College Creek, Dunn Creek, Grizzly Ridge, and Keeler allotments, as well as on the border of the Campbell pasture in the Chalk Creek allotment.  UIN7567, 7536.  The Forest Service relied on a biological evaluation and biological assessment concluding that current grazing would not have a significant adverse effect on critical habitat and fish species.  *Id.*  Plaintiffs take issue with the biological evaluation, which they claim misstates that riparian utilization standards were being met in recent years.  Indeed, the biological evaluation is somewhat misleading, asserting that riparian forage utilization complied with standards in the Chalk Creek allotment since 2000, (although no data had been collected after 2000), in the Blackmore allotment since 1998 (although no data had been collected after 2000), and in the Dunn Creek allotment since 1998 (although no data had been collected since 2002).

Page 33- FINDINGS AND RECOMMENDATION

UIN6943-6944, 6946, 6952, 6955.  However, the biological evaluation relies on much more than

forage utilization data in reaching its conclusions.  UIN6940-6941 (describing reliance on 2008

field reviews, including field notes and photos, hydrologist's analyses, field notes, personal

communications, photos, and 2002 fish habitat condition indicators for the Imnaha subbasin).

    Plaintiffs also note that several of the subwatersheds within the Upper Imnaha subbasin

are designated as "Functioning at Risk" or "Functioning at Unacceptable Risk" in various

characteristics.  UIN7387.  Similarly, plaintiffs observe that the entire Upper Imnaha River is

listed as water-quality impaired on Oregon's 303(d) list for alkalinity, ammonia, chloride,

mercury, sediment, pH, and temperature, while portions of the river are listed for dissolved

oxygen, nutrients, and fecal coliform.  UIN0044.  But plaintiffs do not point to evidence in the

record linking current grazing management to these conditions.  For each allotment, the

biological evaluation adequately explains why current grazing will have no adverse impacts–

either direct or indirect– on fish and habitat.

### d.    Seeps, Springs, and Other Unique Wetlands

    The Forest Service's extraordinary circumstances policy also lists "flood plains, wetlands,

or municipal watersheds" as a resource condition.  36 C.F.R. §220.6(b).  In the two CE decision

memos, the Forest Service reasons that the portion of the Imnaha River floodplain (the Campbell

pasture of the Chalk Creek allotment discussed previously) will not be adversely affect, and that

mitigations proposed will remedy adverse impacts to the one small wetland within the Upper

Imnaha Range Area and "small wetlands within the allotments."  UIN7538, 7567.  Indeed, the

record contains many admissions of livestock's impact on wetlands, for which various

mitigations are proposed.  *See, e.g.,* UIN0054 (Watershed Specialist report recognized that

Page 34- FINDINGS AND RECOMMENDATION

undeveloped springs and wet meadows in the Grizzly Ridge, College Creek, and Chalk Creek

allotments had "elevated levels of trampling and hoof shear with contributions from both wild

ungulate and cattle" and were "at risk of drying as well as gully and rill development with

trampling impacts"); UIN65 ("Cattle elk and deer are impacting accessible springs and wetlands

with trampling and hoof shear" and wetlands or springs in the Snell Creek, College Creek, Chalk

Creek, and Dunn Creek allotments had documented loss of vegetation and site expansion);

UIN0041-0042 (mitigations). As described earlier, however, these proposed mitigations were

insufficiently detailed to demonstrate satisfactory progress towards CMP objective of providing

for "protection, retention, or enhancement of water quality and quantity from natural springs,

seeps and other wetlands." WPOL4986.  For the same reasons, the Forest Service's reliance on

those same mitigations is insufficient to show that continued grazing will not cause a potentially

significant environmental effect on wetlands.  The Forest Service's application of the categorical

exclusion is therefore arbitrary and capricious.

### e.    Sensitive Plant Species

Forest Service policy on extraordinary circumstances also includes "Forest Service

sensitive species" as a resource condition.  36 C.F.R. §220.6(b).  Forest Service identified two

such sensitive species occurring in the Grizzly Ridge allotment– the Snake River Daisy and the

Cordilleran Sedge.  UIN 7447-7449.   A Forest Service biological assessment/evaluation

reviewed the known occurrences of the species in the Wallowa-Whitman Forest and beyond, but

recognized that the lack of historical data or monitoring studies made it impossible to determine

the overall effect of Forest Service management on the species.   In addition, the Forest Service

found that both the Snake River Daisy and the Cordilleran Sedge were susceptible to direct

effects from livestock trampling and eating and the indirect effects from cattle spreading noxious weeds that compete with these species.[11]  UIN 7446-7447.   For both species, the Forest Service's assessment concluded that some individuals were impacted by grazing, and that it is "not currently possible to quantify the impacts or potential impacts to this species" as a whole from current grazing.  UIN7448, 7450.  Nevertheless, the report "assumed that it is not likely that [the impacts] rise to the level of impacting the species as whole at this time." *Id.*

The parties debate the proper scope of the court's analysis concerning sensitive species under the rider's third prong, each relying on seemingly contradictory Ninth Circuit precedent. The Forest Service and intervenors contend that in terms of harm to a species, NEPA directs the court to focus on the degree of adverse effect on a species as a whole, "not the impact on individuals of that species." *Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1010 (9th Cir. 2006) (citing *Native Ecosystems*, 428 F.3d at 1240).  For example, in *Environmental Protection Information Center*, the Ninth Circuit found that proposed logging that could destroy three northern spotted owl nest sites and remove 14 acres of nesting habitat from two critical habitat units would not likely significantly adversely affect the owl or its habitat. *Id.*  This broad focus derives from the NEPA regulation's investigation of the "intensity" of proposed action,

--------

[11] The Snake River Daisy is "particularly prone to disturbance from hoof action" due to their location and springtime grazing in wet soil. UIN447.  They are also incidentally eaten by livestock and "if forage quantity or quality decline in this part of the allotment and if cattle are left in the area too long, there will likely be detrimental impacts as the animals shift from grasses to adjacent vegetation." *Id.*  Although the Cordilleran Sedge has never been monitored or examined for livestock preference, field guides suggested it is a desirable forage for livestock.  It is also shallow-rooted, making it vulnerable to uprooting when pulled by cattle. *Id.* Interestingly, one of the few areas in the allotment where the sedge was expected but not found was near a pond that intensified grazing impacts in the vicinity. *Id.*  Also, the combination of soft ground in the spring and the warmth of the summer "appear to put more grazing/trailing pressure" in the areas where the Cordilleran Sedge grow.  UIN7449.

Page 36- FINDINGS AND RECOMMENDATION

which, in part, is "[t]he degree to which the action may adversely affect an endangered or

threatened *species* or its habitat . . . ."  40 C.F.R. § 1508.27(b)(9) (emphasis added).  But

plaintiffs point out that the same NEPA regulation also stresses that an action's significance must

consider the "context" as well and as the "intensity" of the action.  40 C.F.R. § 1508.27.

"Context," in turn, means the reference to "society as a whole (human, national), the affected

region, the affected interests, and the *locality*." 40 C.F.R. § 1508.27(a) ("For instance, in the case

of a site-specific action, significance would usually depend upon the effects in the locale rather

than in the world as a whole.") (emphasis added).  Thus, plaintiffs insist that analyzing the

potential significance of grazing management on a species should primarily consider the *local*

impacts to the species, instead of the impacts to the species as a whole.  *See Anderson v. Evans*,

314 F.3d 1006, 1018–1021 (9th Cir. 2002) (focusing on the effects of tribal whaling on summer

whale population in local area, rather than on whale species or subgroup, to determine whether

tribal whaling plan might have a significant environmental effect and therefore require

completion of an EIS); *accord Fund For Animals v. Norton*, 281 F. Supp. 2d 209, 234 (D.D.C.

2003) (agreeing with *Anderson* that "uncertainty as to the impact of a proposed action on a local

population of a species, even where all parties acknowledge that the action will have little or no

effect on broader populations, is a basis for a finding that there will be a significant impact and

setting aside a FONSI.").

    Although the Ninth Circuit has never explicitly repudiated its reasoning in *Anderson*,

unpublished Ninth Circuit decisions and district courts in the Ninth Circuit appear to follow the

whole-species focus more recently described by *Environmental Protection Information Center*.

*See Wilson v. Turner*, 257 F. App'x 55, 57 (9th Cir. 2007) ("the adverse impact on the

Page 37- FINDINGS AND RECOMMENDATION

endangered Mexican spotted owl is not significant; at most, only several birds would be affected, not the species."); *Western Waternsheds*, 2012 WL 1094356, at *15 ("it is the effect on a species as a whole– not just individual members of that species– that must be significant"); *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, No. 05-0273-N-EJL, 2008 WL 838718, at *9 (D. Idaho Mar. 27, 2008). Absent guidance to the contrary from the Ninth Circuit, I follow its most recent pronouncement.

Even considering only species-wide impacts, the Forest Service provides no reasoned basis for its conclusion that there is no possibility of significant environmental impact to the Snake River Daisy and the Cordilleran Sedge species. Rather, the Forest Service acknowledged that no monitoring or historical data exists about either species, indicating that their overall prevalence has not been measured. From the Forest Service's record, there is simply no way to know whether the species exist only in this allotment, or are more widespread. And, despite being unable to quantify the impact of grazing on the species, the biological assessment "assumed" – without any further explanation– that the entire species would not suffer a significant impact. The Forest Service therefore did not assess "the degree of the potential effect of a proposed action" on each of these species as a whole, as its own extraordinary circumstances policy requires. 36 C.F.R. § 220.6(b)(2) (the degree of the potential effect of a proposed action on a resource condition determines whether extraordinary circumstances exist and further NEPA analysis must be performed). And unlike cases cited by the Forest Service where impacts to individual members of a species were insufficient to prompt preparation of an EIS, the threshold here is much lower. A CE cannot be used in the presence of a listed resource condition even if it is "*uncertain* whether the proposed action may have a significant effect on the environment." 36

C.F.R. § 220.6(c) (emphasis added). The acknowledged dearth of data about these species

virtually ensures that there is at least some uncertainty about the effect of continued grazing in

the Grizzly Ridge allotment on these two species. And without even the most basic explanation

about the extent of the whole species, I must find the Forest Service's CE decision addressing the

Grizzly Ridge allotment to be arbitrary and capricious. *See Alaska Ctr. For Envm't*, 189 F.3d at

859 ("When an agency decides to proceed with an action in the absence of an EA or EIS, the

agency must adequately explain its decision.").

### B.    North Fork Burnt River CE –  Alder Springs, China Creek, and Snow Creek Allotments

#### 1.    Second Prong

##### a.    Rangeland Health

The same rangeland objective, standards, and monitoring regime established by the

Wallowa-Whitman Forest Plan previously described also apply to the North Fork Burnt River

CE.[12] The North Fork Burnt River CE decision memo relies on four justifications: (1) proper

functioning condition "PFC" assessments of riparian areas (a full assessment in 1997 and a series

of "spot assessments" in 2008) showed progress towards objectives; (2) forage utilization

monitoring in key riparian areas for the past six years showing utilization consistent with Forest

Plan allowable use standards, despite that utilization exceeded standards in the drought year of

2007; (3) the use of Best Management Practices to ensure no degradation of streams with

impaired water quality; and (4) upland condition and trend analyses showing the allotments were

---

[12]  Importantly for this analysis, the Forest Plan provides for monitoring of annual forage utilization in "suitable ranges other than riparian area", i.e. upland areas. WPOL1518.

in good condition with an upward trend in vegetation and soils.  NFBRN210-213.  Plaintiffs

contend that Forest Service's justifications failed to demonstrate progress towards the Forest

Plan's rangeland health objective, specifically with respect to upland areas.  Plaintiffs contend

that the first three stated rationales apply only to riparian areas, and upland condition and trend

data are inadequate because the plots were analyzed too infrequently– once initially in the 1950s,

once again in the 1960s, and most recently in 2007.

The court, however, agrees with the Forest Service that these condition and trend studies

are sufficient to show compliance with the rider's second prong regarding rangeland objectives in

upland areas.  Admittedly, reporting condition and trend data three times in approximately 55

years does not comply with the Forest Plan's monitoring scheme calling for reports every five

years.  However, the Forest Service's range analysis adequately explained why rangeland health

in upland areas was nonetheless satisfactory.  In the Alder Springs allotment, range and soil

conditions at four sites were all "good" in 2007, with stable or upward trends, and the desirable

native plant species that dominated the sites 50 years ago were still present in adequate

frequencies.  NFBRN237.  Similarly, the two sites in the China Creek allotment were in "good"

condition in 2007 with a stable or upward trend, and desirable native plants in those areas were

actually increasing in density.  NFBRN237-238.  Further, the two Snow Creek allotment sites

were in "good" condition in 2007 with a stable or upward trend and the desirable native plants

there were both increasing in the number of species and density of occurrence.  NFBRN238.

The court is not deferring to a "void," as plaintiffs suggest– recent condition and trend

monitoring show that desirable native plant species were either adequate or increasing in all

allotments.

Page 40- FINDINGS AND RECOMMENDATION

b.        Riparian Habitat and Water Quality

The parties focus mainly on whether the Forest Service provided adequate monitoring

data to show satisfactory progress towards or compliance with the PACFISH/INFISH Riparian

Management Objectives (RMOs) described above.  Again, the Forest Service's CE relied on the

same four justifications described previously: Proper Functioning Condition assessments;

riparian forage utilization; Best Management Practices; and upland condition and trend data.

Plaintiffs argue that the Forest Service's justifications are insufficient because they do not

include quantitative data that directly shows compliance with or progress towards

PACFISH/INFISH RMOs, and instead substitute forage utilization data and qualitative Proper

Functioning Condition assessments.  As described above, where the Forest Service chooses to

deviate from established monitoring methods and rely on a proxy to demonstrate progress

towards Forest Plan objectives, the record must include "empirical" evidence to support the use

of that proxy measure to monitor the particular resource.  *Western Watersheds*, 2012 WL

1094356, at *10-11, 17.

The record lacks such empirical support for the Forest Service's reliance on substitute

monitoring here.[13]  In briefing, the Forest Service argues that PFC assessments alone are

_____

[13] Plaintiffs submit the extra-record declaration of expert Jonathan Rhodes, purportedly to explain several key relevant factors that the Forest Service failed to consider in issuing its categorical exclusions, including the need for quantitative data on all stream RMOs to assess compliance with or progress towards those RMOs.  (Rhodes Decl., #119.)  But Rhodes' declaration goes beyond describing factors relevant to the Forest Service's consideration and instead directly disputes the Forest Service's reliance on certain monitoring measures.  The *Western Watersheds* court disregarded extra-record testimony by Rhodes to the extent that it "address[es] the basis for the Forest Service's CE decision, and quibble[s] with the data and/or material taken into account by the Forest Service in reaching its decision . . . ." 2012 WL 1094356, at *7 n.3.  I do the same.

Page 41- FINDINGS AND RECOMMENDATION

sufficient to demonstrate progress towards RMOs because they take into account many of the same factors as the RMOs measure directly. NRBRN 103-105 (listing criteria of PFC assessment). Yet the Forest Service never voiced this explanation in the record, let alone cited any empirical data or studies supporting it. The Forest Service also cites its hydrologist's statement that PFC assessments can generally provide a good understanding of the long term effects of land management on streams. NFBRN102. But even that assertion does not establish that PFC assessments reliably substitute for monitoring of RMOs directly. Finally, the Forest Service cites a user guide stating that PFC assessments can be used to determine trends towards or away from the proper functioning of streams. Not only is this guide contradicted by other Forest Service guidance, but it also does not assert that PFC trend assessments can substitute for quantitative RMO measurements. FSH 2209.21, Ch. 20, § 24.12; (Def.'s Reply, #126, Ex. 3, at 16) ("[PFC] should only be used for status and not trend monitoring"). Nevertheless, the CE decision memo did just that, relying on PFC trend assessments to conclude that "recovery/restoration is continuing with current management . . . ." NFBRN211.

Next, the Forest Service argues that qualitative PFC assessments in conjunction with grass forage utilization data – a quantitative measure– can substitute for measurement of RMOs. But the record provides empirical support only for a more nuanced proposition. A Forest Service guidance document discusses the proper use of forage utilization data and PFC assessments in relation to measurement of RMOs.[14] The guidance first observes that because there is no

---

[14] I agree with the Forest Service that its guidance explaining the limitations of PFC assessments is not independently binding, like a regulation, since it not a substantive rule and does not conform with the procedural requirements of the Administrative Procedure Act. *See W. Radio Servs. Co. v. Espy,* 79 F.3d 896, 901 (9th Cir. 1996) (holding that the Forest Service Manual did not have the force and effect of law). But the guidance certainly illustrates the Forest

scientifically established long-term causal relationship between stubble height and riparian conditions, stubble height should not be used alone as a substitute for long-term ecological monitoring. MPOL1537. The guidance further states that "PFC assessments give managers an indication of limiting and non-limiting factors and as 'coarse filter' provides a tool that, when coupled with more quantitative monitoring (fine filter) can accommodate evaluation of whether PACFISH/INFISH objectives are being achieved." MPOL1542. While PFC assessments lack quantitative substance and "should not be relied upon solely" to determine achievement of RMOs, "achievement of PFC [Proper Functioning Condition] can be a good indicator that detailed quantitative monitoring may not be needed in that reach in the near term, if streamside riparian management objective indicators are also functioning properly." *Id.* Thus, if a stream reach achieves PFC and the management practices and grazing operators remains the same, only future photo monitoring might be called for to demonstrate progress towards RMOs. MPOL1543. By contrast, a stream determined to be Functioning- At Risk (FAR) may require "more intensive monitoring," such as the Cowley Burton protocol that combines annual use monitoring and long-term quantitative measurements to assess livestock impacts on riparian vegetation and streambanks. MPOL1543, 1544.

The Forest Service's approach here differs from the guidance. Where streams did not achieve Proper Functioning Condition, the Forest Service failed to conduct any intensive long-

---

Service's position on the adequacy of PFC assessments and forage utilization in evaluating riparian health and informs the court's evaluation of the propriety of the Forest Service's reliance on PFC assessments and stubble height monitoring to show progress on RMOs.

Page 43- FINDINGS AND RECOMMENDATION

term monitoring that would show progress on RMOs.[15]  In fact, the Forest Service's hydrologist

reported that "[c]urrent monitoring assesses utilization of vegetation, but does not adequately

monitor bank impacts," and recommended the Forest Service monitor bank alteration and

stability using the Cowley Burton procedure, measure the temperature of certain streams, and

analyze some stream cross-sections, all areas that are foci of RMOs. NFBRN118.  Last, even the

forage utilization data cited by the CE decision is mixed, especially in the China Creek allotment,

where grass utilization fell below the allowable standard in 2007.  NFBRN244.  In fact, the

Forest Service's CE acknowledged that "deviations we see in China Creek are of more concern"

and utilization sampling indicated a "potential allowable use issue."  NFBRN212.

    Finally, this case differs substantially from *Western Watersheds*, where the Court found

that the Forest Service properly relied on forage utilization data as a proxy for specific

monitoring of riparian characteristics much like the RMOs at issue here.  2012 WL 1094356 at

*10 (Forest Plan required monitoring of progress towards Aquatic Conservation Strategy

Objectives, including monitoring of pool frequency and quality, percent fine sediment, water

temperature, bank stability, etc.).  There, plaintiff argued that the record contained "none of the

categories of monitoring information necessary to demonstrate that current grazing management

is moving or trending towards [riparian] objectives, and that for the handful of riparian areas that

do have information, the monitoring shows that riparian conditions in these areas were at risk, or

---

[15] Of the nine stream reaches that the Forest Service assessed using the PFC methodology
in 1997, one was Non-Functional and another was Functioning-At-Risk, with seven at Proper
Functioning Condition.  NFBRN211.  In 2008, spot assessments of 11 stream reaches showed
four to be Functioning-at-Risk, with seven at Proper Functioning Condition.  *Id.*  Yet the Forest
Service presents no intensive long-term monitoring of livestock impact on the streams that did
not achieve Proper Functioning Condition.

poor." 2012 WL 1094356 at *10. The *Western Watersheds* court, however, found ample empirical evidence in the record– including studies– stating that the forage utilization measurements could be relied upon to ensure protection of riparian areas and were correlated with riparian conditions, and therefore deferred to the agency's technical expertise in determining the appropriate forms of riparian monitoring. *Id.* at *11. The record in this case is different. Unlike in *Western Watersheds*, the empirical evidence cited in the Forest Service guidance explains that PFC assessments and utilization data cannot substitute for long-term intensive measurement of RMOs for streams not found to be in Proper Functioning Condition. Moreover, Forest Service guidance dictates that there is no scientifically established causal relationship between stubble height and long-term riparian conditions, and forage utilization standards can be met while still not moving towards achievement of RMOs. MPOL1536-1537, 1545. Accordingly, the Forest Service was arbitrary and capricious in finding that monitoring demonstrated satisfactory progress towards or compliance with RMOs in the North Fork Burnt River allotments.

> ## 2. Third Prong
>
> ### a. Sensitive Species

Three sensitive species are present within the allotments at issue in the North Fork Burnt River CE: the redband trout, the Columbia spotted frog, and two sensitive *Botrychium* plant species. The Forest Service determined that the risk of direct and indirect effects to the redband trout was low because the 14 streams containing redband trout were in satisfactory condition and fish habitat conditions within the allotments "are good in respect to a move in a positive direction for the attainment of RMOs and allotments are in compliance with Forest Plan standards."

Page 45- FINDINGS AND RECOMMENDATION

NFBRN108.  The Forest Service also noted that current allotment management minimized

livestock impact to stream and riparian habitat.  *Id.*  Accordingly, current grazing would not

contribute to the loss of viability of the redband trout.  *Id.*  The Forest Service's wildlife biologist

also found that current grazing management may impact individual Columbia spotted frogs or

habitat because grazing could negatively affect frogs if egg masses or recently metamorphosed

frogs were trampled, pond or river banks collapsed from overgrazing, or removed vegetation

resulted in decreased hiding cover and increased desiccation.  NFBRN196-197.  Nevertheless,

the biologist concluded that grazing would not contribute to a loss of viability of the population

or the species.  *Id.*  Finally, the Forest Service's botanist found that the area where the two

*Botrychium* species were known to occur in the China Creek allotment was in good condition

and not adversely impacted by grazing.  NFBRN142.  Consequently, the Forest Service

concluded that current grazing might have impacts on individuals or habitat, but would not result

in a trend towards federal listing for *Botrychium.*  NFBRN153.

Plaintiffs argue that the Forest Service improperly found that the presence of these

species did not constitute extraordinary circumstances because the Forest Service lacked

adequate monitoring to assess the impacts grazing would have on the species in the allotments at

issue.  I find that this is particularly true with respect to redband trout, where the Forest Service

relied on the supposed progress towards RMOs for its conclusion that the risk of adverse effects

to redband trout was low.  Since I found above that the Forest Service's conclusion concerning

progress towards RMOs was inadequately documented, its explanation about the lack of potential

impact on redband trout relying on that conclusion is also deficient.

The Forest Service's determination about the other two species is more thoroughly

explained.  The Columbia spotted frog is known to be widely distributed at least throughout

northeastern Oregon, occurring in numerous small populations.  NFBRN197.  Thus, I defer to the

Forest Service's conclusion that even potential impacts to local individuals or populations of the

species across the allotments where the species was found or where impact was likely to occur

would not potentially have an adverse effect the species as a whole.  And with *Botrychium*, the

Forest Service determined that livestock grazing had not adversely effected its habitat.

NFBRN142.

   Nevertheless, I also agree with the plaintiffs that the Forest Service failed to provide any

explanation whatsoever about the potential significance of cumulative effects on any sensitive

species.  The Forest Service acknowledged past and present actions such as use of roads, timber

harvesting, mining, grazing on private lands, and prescribed fires and wildfires, all of which can

have impacts on soils and watersheds.  NFBRN115.  As described above, the Forest Service need

not catalogue all relevant projects in the area or analyze at length the cumulative impacts of past,

present, and future projects to merely apply a categorical exclusion.  But neither can it neglect to

even briefly explain why the cumulative effects of these other actions would not have the

possibility of creating a significant environmental effect on sensitive species.   Accordingly, the

Forest Service's conclusion that current grazing complied with its extraordinary circumstances

policy is arbitrary and capricious with respect to all three sensitive species.

### III.    Umatilla National Forest

   The Forest Service issued 13 categorical exclusion decision memos concerning

allotments in the Umatilla National Forest.  I therefore briefly review the Umatilla National

Forest Plan objectives, standards, and monitoring schemes, as they guide the courts analysis on

the second prong of the rider for all 13 CE decision.

With regards to rangeland health, the Forest Plan standards require that management activities be designed and implemented to retain sufficient ground vegetation and organic matter to maintain long-term soil and site-productivity. UPOL3311. Management must also provide available forage to meet the requirements of desired populations of big game wildlife species. UPOL3289. The plan establishes maximum allowable annual utilization of available forage in upland areas for forested areas, grasslands, and shrublands, and provides for annual monitoring of soil productivity, range condition and trend, forage utilization (at least 20% of allotments annually with emphasis on allotments with riparian problems), plant and animal diversity, and threatened, endangered, and sensitive wildlife species populations and habitat.  UPOL3295, 3442, 3443, 3444, 3437, 3438.

As to riparian habitat and water quality, the Forest Plan incorporates the PACFISH/INFISH RMOs and sets forth numerous standards and guidelines concerning the evaluation of seeps, springs, bogs, wallows, and other wet areas, UPOL3290, areas in which fish habitat or water quality is being adversely impacted, UPOL3290, and water quality goals for Class I, II, II, and IV streams.  UPOL3290,  UPOL3290, UPOL3291, UPOL3291, UPOL3293. Additionally, the plan calls for meeting or exceeding state water quality requirements in accordance with the Clean Water Act through planning, application, and monitoring of BMPs, and subsequent effectiveness monitoring. UPOL3308-3309.  The plan also requires a cumulative effects analysis where scoping identifies a cumulative impacts concern. UPOL3308. Riparian forage utilization standards and the range goal in the Forest Plan Range section (4-63) are the principal management tools used in achieving desired vegetation conditions in riparian

areas. UPOL3292.

The plan also sets objectives specific to big game, as the Umatilla National Forest is home to large populations of elk.  UPOL3247 (between 2000 and 2010, the Forest Service must provide approximately 181,200 acres of satisfactory cover and a Habitat Effectiveness Index of 67 for big game in the Umatilla National Forest).  For lands within Big Game Winter Range Management Areas, the plan requires managing big game winter range to provide high levels of potential habitat effectiveness and high quality forage for big game species. UPOL 3382.

Although I ultimately must evaluate each CE individually for compliance with requirements of the rider, I organize my analysis by issue, since the parties' broad disagreements repeat in almost all 13 CEs for allotments in the Umatilla National Forest.  Moreover, with respect to these repeated issues, I separate my discussion of the seven Heppner Ranger District CEs and the six North Fork John Day Ranger District CEs, following the parties' organization in briefing and supplemental charts.

      **A.**    **Second Prong**

            **1.**    **Rangeland Health**

                    **a.**    **Heppner Ranger District CEs**

                            **(1)**    **Hardman CE**

Here, the Forest Service relied on a combination of condition and trend data, forage utilization data, and long-term photo monitoring to conclude that range conditions in the Hardman allotment were satisfactory and improving, not merely a single condition and trend site, as plaintiffs insist.  HM794-797.  Plaintiffs also contend that forage utilization data is completely lacking for upland areas.  But the Forest Service determined that riparian utilization was

Page 49- FINDINGS AND RECOMMENDATION

representative of use in the entire pasture, since excessive utilization first becomes evident in

riparian areas, where resource conflicts are likely to occur.  HM795.  The plaintiffs also argue

that current grazing management has not fundamentally changed since an unfinalized EA from

1995 shows range conditions were predominantly only fair or even poor, suggesting that range

conditions now cannot have improved in the intervening years.  (Exhibit 1, #87.)  This EA is not

part of the administrative record, however, and no exception allowing for consideration of extra-

record evidence applies.[16]   In sum, the Forest Service properly relied on the totality of its range

monitoring to conclude that current grazing management was meeting or trending towards Forest

Plan rangeland objectives.

### b.    North Fork John Day Ranger District CE

### (1)    Matlock CE

Plaintiffs also challenge the Forest Service's determination that monitoring showed

satisfactory progress towards rangeland health objectives in the Matlock allotment, particularly

those concerning upland vegetation, soil productivity and stability.  However, I find that the

record contains adequate data– perhaps even more than in the Hardman allotment– to

---

[16] The 1995 Hardman EA is not part of the record because it was not considered by the agency in making the challenged CE decision.  (Mafera Decl., #109.)  Extra-record evidence may be considered: "(1) if necessary to determine whether the agency has considered all relevant factors and has explained its decision,(2) when the agency has relied on documents not in the record,(3) when supplementing the record is necessary to explain technical terms or complex subject matter, or (4) when plaintiffs make a showing of agency bad faith."  *See Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 450 F.3d 930, 943 (9th Cir. 2006)*.* The record contains sufficient evidence of current range conditions to make the 1995 data irrelevant, plaintiff does not present evidence that the EA was considered by the Forest Service, the EA is not necessary to explain technical terms or complex subject matter, and the plaintiffs do not argue the agency acted in bad faith. The same analysis also prevents the court from considering the 1995 Tamarck/Monument EA.  (Exhibit 2, #88.)

substantiate the Forest Service's conclusion.  The Forest Service found forage utilization met

standards at one upland site in 1998 and at several riparian sites 1995 and 2007, read two

condition and trend sites in 2005 revealing satisfactory progress in vegetation and soil conditions

towards Forest Plan objectives, and determined from a field visit that vegetation was sufficient to

maintain long term soil and site productivity.  MAT564-565, 550-551.  The Forest Service's

conclusion therefore was not arbitrary or capricious.

### c.    Thompson Flat CE

The same analysis holds for Thompson Flat allotment as well.  The Forest Service

recorded forage utilization meeting standards at three upland sites in 1998 and two upland sites

in 2005, TF614, read two upland condition and trend sites in 2005 revealing that vegetative

species composition and ground cover on upland plant communities were satisfactorily meeting

or moving toward Forest Plant objectives, TF611, and determined that vegetation sufficiently

maintained soil and site productivity.  TF592-593.  The Forest Service's determination satisfied

the rider's second prong.

### 2.    Riparian Habitat and Water Quality

### a.    Heppner Ranger District CEs

### (1)    Hardman CE

Here, the Forest Service relied on a combination of data to conclude that current

management was making progress towards RMOs in the Hardman allotment, including stream

surveys from the 1990s directly measuring six of seven RMOs in a number of streams within the

allotment, a handful of more recent site visits measuring three RMOs in two streams, forage

utilization monitoring showing standards for riparian grass was met consistently from 1998 to

2005, photo points that record streamside conditions over time, and the construction of partial or

complete cattle exclusion fencing in the mid to late 1990s on many streams.  HM768-782, 795-

796, 619-626, 801-804, 779.  The plaintiffs take issue with each of these types of data, arguing

that none demonstrate actual progress towards RMOs.[17]  They also challenge the Forest Service's

assumption that the existence of partial or complete exclusion fencing on streams can suffice to

demonstrate an "upward" trend toward achievement of RMOs, where older monitoring data

showed streams were not achieving RMOs and no more recent RMO data exists.

        As an initial matter, I agree with plaintiffs that the Forest Service does not point to any

*empirical* data or study showing that the mere existence of exclusion fencing correlates with

progress towards RMOs or that the presence of fencing serves as a proxy to demonstrate

compliance with RMOs.[18]  Without such proof, the court cannot defer to the Forest Service

-----

        [17] Although the plaintiffs primarily focus on data regarding compliance with the
PACFISH/INFISH RMOs, they also argue that the streams in the Hardman and other allotments
exceeded Forest Plan temperature, shade, streambank stability, and sediment standards.
Plaintiffs often intermix their analysis of these Forest Plan standards into their discussion of
RMOs.  I note that several of the Forest Plan standards overlap with RMOs (temperature and
stability) and sediment standards are not strictly quantitative.  Moreover, the Forest Plan
articulates its water quality standards in support of the more broadly phrased objectives of
providing and maintaining a diverse, well-distributed pattern of fish habitats and maintaining or
restoring the biological, chemical, and physical qualities of fish habitats, among others.
UPOL3290; 3262.  Because the PACFISH/INFISH RMOs overlap somewhat with Forest Plan
standards but are more exhaustive, this court mostly focuses its analysis of the sufficiency of the
Forest Service's monitoring to show progress toward RMOs, with the understanding that data
showing satisfactory progress towards or achievement of RMOs would also demonstrate a trend
toward Forest Plan riparian and water quality objectives.

        [18] As discussed below, a 2005 site visit on Colvin Creek provides anecdotal support for
the notion that, at least in the Hardman allotment, exclusion fencing had a beneficial effect on
streambank stability. However, the record contains several instances in other allotments where
permittees' failure to maintain exclusion fences allowed grazing in purportedly excluded areas.
And, as discussed more below, direct monitoring of RMOs on streams that feature exclusion
fencing undermines the assumption that the fencing necessarily correlates with progress toward

Page 52- FINDINGS AND RECOMMENDATION

unsupported assumption that exclusion fencing necessarily improves RMO stream attributes. Accordingly, I will not rely on the Forest Service's reference to exclusion fences, in isolation, as justification for showing a trend towards achievement of RMOs. The rider's second prong calls for actual monitoring to demonstrate satisfactory progress towards Forest Plan objectives, and therefore I examine the monitoring in the record before me.[19]

RMO monitoring apparently from the 1990s presents a mixed picture, with some or most RMOs not being met for each stream measured in the allotment.[20] HM781. I agree with plaintiffs that this historical data is stale and that reliance on the monitoring from the 1990s alone would be

_____

RMOs.

[19] Plaintiffs argue that the court should analyze the Forest Service's monitoring in both fishbearing streams and in Riparian Habitat Conservation Areas (RHCAs), which include non-fishbearing perennial streams, intermittent streams, and wetlands that connect to fishbearing streams. Plaintiffs contend that since PACFISH/INFISH creates specific standards for RHCAs that refer to RMO compliance, the Forest Service must also monitor conditions to show progress towards RMOs on the non-fishbearing streams in the various. Intervenors point out that initial compliance monitoring for PACFISH/INFISH during 2000-2002 was limited to only Category I streams (i.e. fishbearing streams), implying that the Forest Serve has no obligation to track RMOs in RHCAs. UIN5474. The Forest Service does not directly dispute plaintiffs' contention that some monitoring must occur in RHCAs, but instead counters that the Forest Service properly considered the effects of grazing in RHCAs in the Hardman and other Heppner Ranger District allotments. It is not clear to this court that the RHCA standards necessarily extend the PACFISH/INFISH RMO monitoring requirements to all RHCAs, or that the Forest Service must demonstrate compliance with or progress towards RMOs in RHCAs to satisfy the second prong of the rider. I therefore defer to the Forest Service's discretion in structuring its own monitoring program and restrict my review to the sufficiency of the monitoring data collected on streams the Forest Service itself identified for PACFISH/INFISH compliance in its various biological evaluations.

[20] It is not entirely clear when baseline RMO data in this allotment were originally gathered. For example, the biological evaluation for this allotment indicates streambank stability data was gathered in 1992 and temperature data from 1995-2004, but does not indicate when other RMOs like large woody debris, pool frequency and quality, and width/depth ratio were first recorded. The Forest Service admits it has never measured lower bank angle, another of the RMOs, for any of the allotments at issue in this case.

Page 53- FINDINGS AND RECOMMENDATION

insufficient to demonstrate compliance with or progress towards the RMOs when the CE was

issued in 2005.  *See Western Watersheds*,  2012 WL 1094356, at *9; *N. Plains Res. Council, Inc.*

*v. Surface Transp. Bd.*, 668 F.3d 1067, 1086 (9th Cir. 2011) (ten-year-old data considered stale);

*Lands Council v. Powell*, 395 F.3d 1019, 1031 (9th Cir. 2005) (six-year-old data also stale).  But

the older RMO data is not the only monitoring in the record, and even stale data in conjunction

with newer monitoring may suffice.  *See Western Watersheds*, 2012 WL 1094356, at *9 ("while

defendant does rely on some monitoring information that might well prove too outdated to

support the Big Ridge CE if relied on as the sole proof of current monitoring trends, defendant

also relies on other, updated data as proof of current monitoring.")

    Here, the Forest Service performed some limited RMO monitoring in recent years

revealing at least some progress towards RMOs. Stream temperatures recorded from 1998 to

2004 varied year to year with no discernable trend, HM768-769, 772, 776, 781, and 2003

monitoring in the Wilson and Big Walls streams showed that width/depth ratio had deteriorated

over time, but two other RMOs– pool frequency and quality, and streambank condition– actually

improved.  HM770-771, 773-774.

    Moreover, other monitoring besides direct, quantitative RMO observation indicated some

improvement in riparian conditions, although the Forest Service did not explicitly rely on this

information in concluding that progress was being made toward RMOs.  A 2005 site visit to

Colvin Creek, which features a cattle exclusion fence, found a substantial improvement in bank

stability to over 70%, with no evidence of cattle along the stream, and revegetation occurring in

areas where the bank was unstable, leading to the observation that "fish habitat in this stream is

improving."[21] HM771, 781.  Residual stubble height standards for riparian grasses were

consistently met from 1998-2005, although there was no monitoring of utilization of riparian

shrubs.  HM795-796.  Field visits comments done along with stubble monitoring also document

vegetation growth.  HM146, 387,393,396,442.   Finally, photos showed increased streamside

vegetation at photo points.  HM619-626, 801-804.

Overall, the Forest Service does not present compelling evidence of widespread

compliance with or progress towards RMOs.  Nevertheless, the record is not completely devoid

of indicia of progress, as plaintiffs suggest.  I therefore cannot conclude that the Forest Service's

determination, based on the totality of its quantitative monitoring data, qualitative observations,

and exclusion fencing, was arbitrary and capricious.  Importantly, the Forest Service's use of

quantitative RMO monitoring and long-term observation techniques such as photo points in this

allotment distinguish it from the type of monitoring the Forest Service relied upon to support its

North Fork Burnt River and Upper Imnaha CEs, addressed above, which included no quantitative

measurements of RMOs whatsoever.

### (2)    Little Wall CE

The plaintiffs make many of the same arguments about the Little Wall CE as with the

Hardman CE.  They contend that the Forest Service cannot rely on the assumption that exclusion

---

[21] The parties dispute whether this observation consists of just a qualitative observation or quantitative measurement of the streambank stability RMO according to some established and scientifically reliable protocol.  Since the Forest Service indicated that this result came from a site visit as opposed to a stream survey, did not incorporate the result into its tabulation of RMO monitoring, and provided no other evidence in the record establishing the method or reliability of its observation, I can only assume that the site visit reports a qualitative assessment rather than a quantitative measurement of the RMO.  HM771.  Indeed, in other similar Biological Evaluations in the same ranger district described below, the Forest Service noted that site visits yielded qualitative assessments, rather than quantitative monitoring.

fencing demonstrates an upward trend in RMOs, historic monitoring shows most RMOs were not met, and recent monitoring shows a deteriorating trend in RMOs that were measured in the 1990s.  Moreover, the plaintiffs fault the Forest Service's conclusion that **"**[m]onitoring associated with  . . .  continued grazing will prevent degradation of the [RMOs] currently being met and will not retard attainment of [RMOs that were not met.]"  LW1316-1317.

Again, although I agree with plaintiffs that the Forest Service cannot simply use the existence of fencing to demonstrate progress towards RMOs, there is adequate monitoring evidence in the record supporting the Forest Service's conclusion that the second prong of the rider had been satisfied. The record reflects that some RMOs were met in the 1990s.  In more recent years, some RMOs remained stagnant or deteriorated.  LW1303, 1308 (temperature measurements from 1995 to 2004 show only two stream even approaching state requirements for steelhead, with no trend apparent);  LW1304 (amount of large woody debris in Little Wall creek deteriorated since early 1990s, with two of three stream reaches falling below RMO threshold in 2000 where they previously met RMO); LW1306, 1309-1311 (width to depth ratio deteriorated in Little Wall creek in 2000 and 2004 and Skookum creek in 2004).  At the same time, other RMOs improved.  LW1305 (number of pools per mile increased in Little Wall creek in both 2000 and 2004); LW1306-1307 (bank stability increased in Little Wall creek from 2000 to 2004); LW1307, 1308 (bank stability of Lovelett creek increased by 2004); LW1309 - 1311 (amount of large woody debris and pool frequency increased in Skookum creek in 2004, LWD and Pool Frequency increased).  Moreover, riparian forage utilization standards for grasses were met, and soil and vegetation conditions had improved.  LW1334-1336.  Overall, as with the Hardman allotment, I defer to the Forest Service's conclusion that the existence of exclusion

fencing along with comparisons of historical and recent RMO data and other monitoring

indicated progress towards RMOs.

### (3)    Monument CE

In the Monument allotment CE, the Forest Service again relies on a comparison of

historical surveys of RMOs in 1989-1993 with recent surveys in 1997-2003 on a few streams,

plus the assumption that exclusion fencing ensures progress towards RMOs.[22]  MN1367.  Much

like in the Hardman and Little Wall allotments, both the historical and more recent data are

mixed, with current monitoring showing improvement in temperature, pool frequency, and

streambank condition, but deterioration in width to depth ratio and percentage of shade.

MN1355, 1360, 1368 (temperature); MN1362 (pool frequency); MN1363 (streambank

condition); MN1362, 1363 (width/depth ratio); MN1363 (shade).  Other indicators such as

compliance with forage utilization standards, a 2005 qualitative assessment showing improved

streambank stability, and the presence of exclusion fencing generally support the Forest Service's

conclusion.  MN1356 (bank stability of one stream in 2005 was "qualitatively assessed" to be

around 60-70%, an improvement over past monitoring); MON1254-65, 1382-83 (riparian

utilization); MON 1368 (fencing).  I therefore cannot find the Forest Service was arbitrary or

capricious in concluding that monitoring evidenced satisfactory progress towards riparian

objectives.

### (4)    Tamarack CE

The Forest Service again relies on a comparison of historic and more recent stream

_____

[22] The Forest Service's biological evaluations for all the allotments in the Umatilla
National Forest appear to utilize a single boilerplate explanation for RMO compliance, with
slight modifications in each allotment.

surveys and the presence of exclusion fencing.  TM1308.  The use of exclusion fencing in this

allotment is problematic, with multiple reports of fence maintenance problems leading to

unauthorized grazing.  TAM1308, 0069, 0134, 0924, 0928-30, 1212-23, 1246.  Few RMOs were

attained in historical surveys.  *Id.*  And recent RMO monitoring was particularly sparse, with

only one stream re-surveyed on two RMOs.  TAM1300,1301.  Even that minimal monitoring

yielded mixed results, with pool frequency improving and width/depth ratio declining.  *Id.*  Grass

stubble height standards were satisfied and a site visit to one creek found improvement in shade.

TAM1245-1246, 1302.  Overall, as with the previously discussed Heppner Ranger District CEs, I

defer to the Forest Service's conclusion that monitoring demonstrated progress towards riparian

objectives, although I note that the Tamarack CE and the two others discussed next (the Yellow

Jacket and Collins Butte CEs) surely represents the outer boundary of this court's capacity for

exercising such deference.

### (5)      Yellow Jacket CE

In the Yellow Jacket CE, the Forest Service relies exclusively on the comparison of

historical and updated stream surveys to show progress towards riparian objectives, since

exclusion fencing is not present in this allotment.  Although the majority of RMOs were not

attained historically, four streams met the RMO for large wood, three met the RMO for

width/depth, and two met the RMO for bank stability.  YJ394.  Recent quantitative data is sparse,

with temperature improving on one stream in the allotment, but no other recent RMOs measured

directly.  YJ389.  However, the Forest Service conducted site visits to all streams in the allotment

in 2005, reporting that qualitative assessments satisfied the RMO for bank stability, and that bank

instability where it existed was due to deer and elk crossings, not cattle use.  YJ391.  In light of

Page 58- FINDINGS AND RECOMMENDATION

the recent quantitative and qualitative improvement in at least some RMOs, I do not find the Forest Service's conclusion concerning riparian objectives to be arbitrary or capricious.

### (6)    Collins Butte CE

I reach the same conclusion regarding the Forest Service's explanation in the Collins Butte CE.  Historical surveys failed to measure some RMOs and showed that streams failed to attain others.  CB618-619.  Recent monitoring indicated improvement in stream temperature in one creek, although the temperature of four other creeks remains relatively static, far from meeting the RMO standard.  CB606, 609-610.  Although the Forest Service did not conduct any recent stream surveys, site visits to unidentified streams in 2005 and 2006 found bank stability qualitatively meeting RMOs.  CB608, 615.  Forage utilization met standards and a variety of comments recorded along with forage utilization measurements detailed signs of riparian health.  CB020, 021, 043, 346-347, 377, 383.  The single instance of demonstrated progress on one RMO combined with the more indirect observations of riparian condition provide sufficient explanation of the Forest Service's determination.

### (7)    Ditch Creek CE

As with the Hardman, Little, Wall, and Monument CEs, here the record contains adequate evidence to support the Forest Service's conclusion that monitoring showed progress towards riparian objectives, even though the Forest Service ostensibly relied only on the existence of exclusion fencing to demonstrate that progress.  DC1238.  Monitoring from the 1990s revealed that at least half of streams in the allotment had attained RMOs for bank stability, width/depth ratio, and large woody debris.  DC1238.  On one hand, recent monitoring showed stream temperature had been either static or deteriorating, with only a handful of streams even

Page 59- FINDINGS AND RECOMMENDATION

close to meeting RMO standards.  DC1215, 1217-1218, 1221-1222, 1224-1225, 1227-1228.  Yet

an updated survey of one creek in 2004 also demonstrated that the creek met RMO criteria for

bank stability and found improvement in both pool frequency and shade, although the data also

showed deterioration in width/depth ratio and large woody debris.  DC1225-1230.  Additionally,

as with the other allotments, grass stubble height standards were met and anecdotal observations

attested that riparian areas were showing minimal impacts from grazing.  DC1151-1152, 0056,

0061, 00122, 0126.  With mixed monitoring results showing some progress in some areas, as

well as other information that suggested improved riparian conditions, I cannot find the Forest

Service's conclusion to be arbitrary or capricious.

### b.    North Fork John Day Ranger District CEs

### (1)    Lucky Strike CE

In contrast to the previously discussed allotments, here the Forest Service did not present

adequate monitoring data to justify its conclusion that satisfactory progress was being made

towards RMOs.  There are two perennial fishbearing streams on allotment, Owens Creek and

Lane Creek.  LS1085.  The Forest Service explicitly relies on purported comparisons of historical

and recent stream surveys, the existence of exclosure fencing on stream, and stubble height

monitoring to show that progress is being made towards attaining RMOs.  LS 1098,1056-1057.[23]

Historical stream surveys, apparently from the late 1980s and early 1990s, revealed that only the

large woody debris RMO had been attained, on Lane Creek.  LS1048-1053.  And even there, the

Forest Service noted that a rapid die-off of trees in the late 1980s and early 1990s due to disease

---

[23] In briefing, the Forest Service also argues that photo point monitoring demonstrates
management practices have led to less cattle impacts in riparian areas.

led to an influx of wood in the streams, and anticipated a long-term deficiency in large woody debris in the future while the understory matures.  LS 1052.   The only recent quantitative monitoring of RMOs consists of stream temperature, with both streams showing static trends and temperatures well short of the RMO requirement.  LS1049, 1051-1052.  The Forest Service "estimated" the bank stability of Owens Creek at nearly 100% in 2005, but provided no details or methodology about the reliability of that qualitative assessment.  LS1050.  In sum, most of the evidence relied upon by the Forest Service to show progress towards attaining RMOs – exclusion fencing, forage utilization, photo points– are proxies for RMO measure with no empirical assurance that they correlate to RMO improvement.  And the rest– the 2005 estimate of streambank stability on Owens Creek– is not actually monitoring *data*.  Indeed, the only true monitoring data, temperature, shows no progress at all.   Accordingly, the Forest Service's assertion that monitoring satisfies the rider's second prong for the Lucky Strike CE is arbitrary and capricious.

### (2)    Klondike CE

The Forest Service adequately supported its conclusion that monitoring in the Klondike allotment showed progress towards RMOs.  Historic surveys showed a handful of RMOs were attained on the four fishbearing streams in the allotment.  More recent monitoring indicated that one of the streams, Pearson Creek, still continued to meet the RMO for temperature, showed improvement in large woody debris and pool frequency, but decline in the width/depth ratio.  KLD1010-1012.  These data, in conjunction with appropriate stubble utilization, photo monitoring indicating decreased livestock use of riparian areas, and the partial exclusion of cattle from two streams in the allotment, satisfy the Forest Service's burden under the rider's second

Page 61- FINDINGS AND RECOMMENDATION

prong.

### (3)    Matlock CE

Historical monitoring in the allotment showed compliance with two of six RMOs in both streams present in the allotment.  MAT526-529.   The only recent monitoring reveals that the temperature of Fivemile Creek has been relatively stable between 1992 and 2005, far from attaining the RMO requirement.  MAT528.  The Forest Service also reported that "[f]ield visits within the allotment boundary indicate streambank stability is greater than 90%," but failed to identify the date or location of those visits, or provide any exact stability measurements.  MAT 529.   Comments recorded during riparian stubble utilization generally showed an improvement in riparian health, as did photo point monitoring.  MAT021-023, 044-055, 077-086, 109-117, 160-161, 245-264, 315-323, 510-523, 560-560, 569-571.  As with the Lucky Strike allotment, the historical data indicated that few RMOs were met and the only recent quantitative monitoring for the Matlock allotment failed to demonstrate any progress towards RMOs.  I therefore conclude that the Forest Service's determination that monitoring showed compliance with or satisfactory progress toward RMOs in this allotment is arbitrary and capricious.

### (4)    Thompson Flat CE

As with most of the other allotments discussed above, the Forest Service relied on adequate data to conclude that grazing management was meeting or progressing towards riparian objectives in the Thompson Flat allotment.  Historic and recent monitoring showed some RMOs had been attained.  TF419-429.  Recent monitoring showed one creek in the allotment met the RMO for stream temperature, although two other streams were far from attaining the RMO criteria and showed no sustained recent progress.  TF423.  Further, an updated survey on

Page 62- FINDINGS AND RECOMMENDATION

Potamus creek evidenced compliance with the RMO for bank stability,  improvement on two indicators (pool frequency and shade), but deterioration in width/depth ratio.  TF424-426.  These quantitative measurements were also strengthened by consistent compliance with riparian forage utilization from 1995 to 2006, TF614, photo point monitoring, TF530, 611, and observations from field visits.  TF071, 316.  The Forest Service therefore adequately supported its conclusion that current grazing was either meeting or moving towards RMOs in this allotment.

### (5)    Central Desolation CE

By contrast, the Forest Service's monitoring data is inadequate to demonstrate progress towards attainment of RMOs in the Central Desolation allotment.  Historical surveys of RMO data occurred on some streams in the allotment in the mid-1990s and on others in 2000, but those surveys reflect that only a handful of RMOs were met on three of the many streams in the allotment.[24] CD756-780.  The Forest Service, however, did not update those surveys or gather data in recent site visits to show an upward trend towards achieving other RMOs, even though Forest Service's Biological Evaluation asserted that upward trends in RMOs were demonstrated by comparisons between historical and recent surveys. CD774-775.  The only data the Forest Service collected within the eight years prior to 2008 CE was stream temperature, and that data showed streams far from achieving the RMO temperature target with either static or worsening trends.  CD757-758, 760-761, 763-764.   The Forest Service argues that forage utilization and photo monitoring show adequate progress towards RMOs.  But, as described earlier, forage utilization has not been shown to be a reliable substitute for RMO measurements, especially

---

[24] The Biological Evaluation includes a chart indicating that certain RMOs were also attained on Peep Creek and Brush Creek , but does not cite any substantiating data.  CD774-775.

where, as here, many stream criteria were qualitatively described as "Functioning-At-Risk." CD791-816. The Forest Service also relied on the existence of "physical barriers" and geographical features preventing cattle from accessing streams as evidence that current grazing is consistent with riparian objectives. CD930 (Decision Memo). Yet such explanations do not constitute monitoring data that the rider's second prong requires, nor does the Forest Service otherwise provide empirical evidence suggesting that the erection of physical barriers is a reliable proxy for progress towards attaining RMOs. In sum, I find the Forest Service's conclusion that current grazing management in the Central Desolation allotment was moving towards or achieving RMOs to be arbitrary and capricious.

(6)    <strong>Texas Bar CE</strong>

The Forest Service's explanation with this allotment suffers from the same flaws. Historical surveys in the 1990s showed some attainment of RMOs on some streams. TB1245-1246. Just as in the Central Desolation biological evaluation, the Forest Service purported to identify "upward" trends toward RMOs in this allotment based on a comparison between historical and updated surveys or site visits, but apparently conducted no such recent visits. TB1245. The only recent monitoring data measured stream temperature from the early 1990s to 2007, revealing temperatures failing to attain the RMO threshold with either static or deteriorating trends. TB1224, 1229-1230, 1232. Moreover, as discussed above, the court cannot defer to the Forest Service's conclusion based on riparian forage utilization and photographic evidence alone, absent empirical evidence that those are reliable substitutes for quantitative RMO measurement. The Forest Service's use of the categorical exclusion in the Texas Bar allotment, therefore, is also arbitrary and capricious**.**

Page 64- FINDINGS AND RECOMMENDATION

**B.**    **Third Prong**

     **1.**    **Progress Towards Wildlife and Diversity Objectives– Heppner**

          **District CEs**

As previously stated, the Umatilla Forest Plan includes an objective specific to big game, as the Umatilla National Forest is home to large populations of elk.  Specifically, the Forest Service must  provide approximately 181,200 acres of satisfactory cover and a Habitat Effectiveness Index of 67 for big game in the Umatilla National Forest between 2000 and 2010. UPOL3247.  For lands within Big Game Winter Range Management Areas, the plan also includes the goal of managing big game winter range to provide high levels of potential habitat effectiveness and high quality forage for big game species. UPOL 3382.  Standards and guidelines for the management area also dictate available forage be allocated to meet big game management objectives, with excess being allocated to livestock, and "the quantity and quality of forage for big game will be enhanced or maintained through improved livestock grazing systems, controlled seasonal use, an active prescribed burning program, and other measures."  UPOL3384.

 As discussed above and in *Western Watersheds*, the rider's invocation of "objectives" broadly encompasses objectives, goals, standards, and guidelines found in the Forest Plan, but the Forest Service is not necessarily bound to conduct all of the monitoring called for in the Forest Plan to satisfy the second prong of the rider.  But, I agree with plaintiffs that to rely on a categorical exclusion for allotments within big game management areas (Hardman, Little Wall, Monument, Tamarack, Collins Butte, and Ditch Creek), the Forest Service must provide some monitoring to adequately demonstrate its current grazing management provides sufficient forage and cover for elk.

Page 65- FINDINGS AND RECOMMENDATION

Here, Forest Service biologists analyzed the potential conflict between elk and cattle, including with regards to forage and cover.  The Forest Service found that cattle do not trample or otherwise affect elk thermal or hiding cover; and rotational grazing, annual compliance with forage utilization and low livestock density ensure elk have adequate forage.  CB642-643, HM710-711, MON1322-1323, LW1216-1218, DC1073, DC1276, TAM1165-1165.  Plaintiffs counter that the Forest Service failed to monitor upland forage utilization in the Hardman, Little Wall, Monument, and Tamarack allotments, suggesting that forage in those areas may be insufficient for elk.  But, with respect to each of those allotments, the Forest Service explained that riparian utilization is representative of upland utilization, because riparian areas are where excessive utilization first becomes evident and where utilization may cause resource conflicts. HM795; LW1334; MON1381; TAM1245.  In sum, I cannot find that the Forest Service was arbitrary and capricious in determining that current grazing management complied with Forest Plan objectives for wildlife.

2.    **Federally Designated Critical Habitat for Listed Fish, Threatened Steelhead, and Sensitive Redband Trout**

a.    **Heppner Ranger District CEs**

The seven allotments in the Heppner Ranger District CEs, comprising over 160,000 acres, contain over 100 miles of fishbearing streams that are Designated Critical Habitat.  The allotments also may contain Threatened steelhead and Sensitive redband trout.  In each CE, the Forest Service relied on biological evaluations and assessments determining that current grazing management: (1) may affect redband trout individuals or their habitat, but would not likely contribute to a trend towards federal listing or cause a loss of viability to the population or

species; and (2) may affect steelhead, but not likely adversely affect them or their critical habitat. In addition, the Forest Service relied on analyses from the National Marine Fisheries Service (NMFS) concurring with the Forest Service's conclusions about steelhead and their habitat.  *Id.* The plaintiffs argue that all seven Forest Service CEs for allotments in the Heppner district fail to satisfy the third prong of the rider because they lack adequate evidence to conclude that current grazing would have no possible significant environmental effect on threatened and sensitive fish, Designated Critical Habitat, and on the Columbia spotted frog.

As an initial matter, I generally recognize the Forest Service's entitlement to rely on reasoned analyses of the NMFS, *See Hells Canyon Pres. Council v. Jacoby*, 9 F. Supp. 2d 1216, 1243–44 (D. Or. 1998).  Here, however, both the NMFS concurrences and the Forest Service's biological evaluations in many instances rely heavily on the attractive but empirically unsupported assumption that the use of exclusion fences on fishbearing streams prevents adverse impacts of livestock grazing to fish and their habitat.[25]  UPOL6829 (Hardman concurrence), HM780 (Hardman BE), UPOL6832 (Little Wall concurrence); LW1315 (Little Wall BE), UPOL6834 (Tamarack/Monument concurrence), MN1367 (Monument BE), TAM1307 (Tamarack BE), UPOL6827 (Ditch Creek concurrence), DC1236-1237(Ditch Creek BE).   For example, the complete analysis of the potential impact of continued grazing on redband trout in the Hardman biological evaluation reads:

> **Rationale:** The majority of fish bearing streams in this allotment are excluded from grazing with hard fence. Approximately 5 miles of resident fish bearing streams are not

---

[25] The Forest Service does not rely on the presence of fencing in the Yellow Jacket or Collins Butte allotments.   YJ393-394 (redband trout found only in isolated springfed pools); CB523-524, CB616-618 (no spawing habitat for steelhead, redband trout observed in only a few isolated areas).

fenced and effects from grazing along these streams are expected to be negligible as either access for cattle is extremely limited due to an abundance of large wood or monitoring of the pastures allows for movement of cattle prior to adverse affects to unfenced streams.

HM780.  As discussed above, the Forest Service cannot point to any empirical data or studies indicating the effectiveness of exclusion fencing in protecting fish and fish habitat.  Nor can the Forest Service point to actual surveys of fish populations to directly establish that fencing and other management techniques have prevented significant impacts from livestock.  Further, the RMO data reviewed above also undercuts the assumption that fencing eliminates the risk of adverse effects from grazing, since many RMO indicators meant to measure the health of fish habitat declined, even in areas where fencing had been established for years.  Moreover, while I concluded that Forest Service was not arbitrary and capricious to conclude that monitoring in many allotments showed satisfactory *progress* towards attainment of RMOs, that conclusion does not necessarily imply that the grazing is no longer adversely affecting fish and fish habitat in a significant manner.  Indeed, many RMOs remain unmet even in those allotments where the Forest Service found improvement and monitoring even shows deterioration of some indicators of riparian health. Yet the Forest Service has not addressed these mixed monitoring data head-on to explain why, nevertheless, there is no possibility that fish and their habitat are being adversely impacted by grazing.

Defendants and intervenors seem to argue that even if current grazing may be significantly affecting fish or fish habitat locally, the plaintiffs fail to illustrate how fish species as a whole will be affected, a prerequisite for preventing use of a categorical exclusion.  Again, in determining the significance of an environmental effect on a species under NEPA, the focus is properly placed on the species as a whole.  *See Envtl. Prot. Info. Ctr*, 451 F.3d at 1010.  But here

Page 68- FINDINGS AND RECOMMENDATION

the Forest Service has not even described, for example, the quantity and quality of redband trout

habitat that is necessary to ensure the viability of that species in these allotments.  And it

certainly has not presented any analysis discussing the distribution of the fish species outside the

allotments at issue, and the impact of potential habitat degradation locally on the entire species.

The plaintiff does not bear that burden.  If the Forest Service wishes to satisfy the rider's third

prong, it must adequately explain the magnitude of possible local effects on fish populations and

habitat and describe why those effects will not impact the viability of fish species or its habitat on

a larger scale.  *See California v. Norton*, 311 F.3d 1162, 1177 (9th Cir. 2002) ("Where there is

substantial evidence in the record that exceptions to the categorical exclusion may apply, the

agency must at the very least explain why the action does not fall within one of the exceptions.").

   In the same vein, I am also disturbed by the Forest Service's failure to recognize, let alone

address, the potential cumulative effects on fish and habitat of continued grazing in all the

challenged Heppner Ranger District allotments, which collectively cover over 160,000 acres.[26]

*See* 40 C.F.R. § 1507.27(b)(7).  Therefore, even though the Collins Butte and Yellow Jacket

---

   [26] As explained above, when the Forest Service's scoping reveals other actions with the potential to cause cumulative effects, Forest Service has an obligation to at least explain why those effects would be insignificant, although the law does not clarify how deeply the Forest Service must analyze those impacts in the context of a categorical exclusion.  Here, the Forest Service's decision memos and supporting documents did not even mention the possibility of cumulative effects on fish or fish habitat.  Four of the CE decision in the Heppner Ranger District – the Hardman, Little Wall, Tamarack, and Monument CEs– were all issued on the same date by the Heppner District Ranger.  HM863, LW1426, TAM1341, MON1458.  Two others were issued less than a year later, again on the same date by the Heppner District Ranger.  CB 711, YJ469.  A final CE was issued the following year.  DC1424.  Thus, it strains credulity to believe that the Forest Service's scoping did not identify the four initial simultaneous CE decisions concerning grazing on adjoining allotments as present actions with the potential to create cumulative effects on fish and their habitat.  Likewise, the Forest Service's failure in the later Heppner District CEs to even acknowledge the prior CE decision and their potential to cause cumulative impacts is equally concerning.

Page 69- FINDINGS AND RECOMMENDATION

biological evaluations do not rely on the presence of exclusion fencing in the extraordinary

circumstances analysis, the Forest Service fails to explain why there is no potential for significant

effects on fish and their habitat from the aggregate impacts of the individual Heppner Ranger

District grazing reauthorizations.  For these reasons, I find that all the Heppner Ranger District

CEs to be arbitrary and capricious in determining that there is no possibility of significant

environmental effects on Threatened steelhead, Designated Critical Habitat for steelhead, and

Sensitive redband trout and concluding, therefore, that the use of categorical exclusions was

appropriate.

### b.    North Fork John Day Ranger District CEs

The Forest Service likewise relied heavily on the presence of exclusion fencing in the

Lucky Strike, Klondike, and Matlock allotments to conclude that continued grazing would not

cause a loss of viability of redband trout populations. LS1056 ("The majority of fish bearing

streams in this subwatershed are excluded from grazing with hard fence"); KLD1027; MAT536.

The NMFS concurrences also relied on fencing in those allotments to justify their determinations

with respect to steelhead, and the Forest Service, in turn, cited those concurrences for their

steelhead determinations.  UPOL6831-6833.  For the same reasons described above with respect

to the Heppner Ranger District CEs, I conclude that the Forest Service failed to adequately

support its conclusions that continued grazing could not possibly significantly affect steelhead or

redband trout habitat.  This flaw renders the Lucky Strike, Klondike, and Matlock CEs arbitrary

and capricious with respect to the rider's third prong.[27]

---

[27]  Unlike with the Heppner Ranger District allotments, plaintiffs do not advance a cumulative effects argument with respect to the North Fork John Day Ranger District allotments, perhaps because the challenged allotments are not geographically contiguous.

Page 70- FINDINGS AND RECOMMENDATION

3.      **Sensitive Columbia Spotted Frog**

a.      **Heppner Ranger District CEs**

The Columbia spotted frog is also known or suspected to exist on all seven allotments within the Heppner Ranger District.  HM683-688; LW1227-1233; MON1299-1304; TAM 1174-1180; YJ408-411; CB627-632; DC1247-1252.  With respect to each allotment, the Forest Service wildlife biologists determined that continued grazing might impact individual frogs or frog habitat, but would not likely contribute to a trend towards federal listing or cause a loss in viability to the "population or the species."  Unlike with steelhead and redband trout, here the Forest Service carefully analyzed various potential interactions between grazing and the Columbia spotted frog and provided citations to scientific literature to support its conclusion that grazing would have, at worst, some potential for impacts to just a few individuals within the allotment.  *See, e.g.,* HM686 (citing studies finding no scientifically significant difference in the abundance of recently metamorphosed Columbia spotted frogs and other similar amphibians between grazed and ungrazed ponds in eastern Oregon to support the determination that the "potential for injury [to tadpoles] is relatively small and limited to an occasional individual").

This more detailed explanation of the insignificance of the magnitude of potential impact is crucial.  It provides the reasoned basis for the Forest Service's overall conclusion that grazing would not contribute to a trend towards loss of viability of the "population or species."  Even though Forest Service's use of the term "population" is ambiguous– it could mean the population within the allotment or some larger area– under any definition, the Forest Service rationally determined that even impacts on "occasional" individuals would not significantly impact the "population."  It stands to reason that if grazing would not impact the "population," it also would

Page 71- FINDINGS AND RECOMMENDATION

not impact the "species." Thus, even without discussing the species as a whole, I cannot find the Forest Service's conclusion concerning impacts to the Sensitive Columbia spotted frog to be arbitrary or capricious. *See, e.g.,* CB 629-632.

### b.    North Fork John Day Ranger District CEs

I adopt the identical analysis with regards to the Forest Services' discussion of the Sensitive Columbia spotted frog in the North Fork John Day Ranger District CEs. The Forest Service's biological evaluations for these allotments provide the same well-supported explanation about the insignificance of grazing impacts on the frogs. LS0802, KLD0787, MAT473-475, TF459-462; CB852-855; TB1150-1153.

### 4.    Congressionally Designated North Fork John Day Wild and Scenic River– Central Desolation and Texas Bar CEs

Approximately 1,500 acres of the Central Desolation and Texas Bar allotments overlap with the North Fork John Day River's Congressionally designated Wild and Scenic River Management Area. CD929, TB1315. "Congressionally designated areas, such as wilderness, wilderness study areas, or national recreation areas" are among the resource conditions listed in the Forest Service's extraordinary circumstances policy. 36 C.F.R. § 220.6(b). Plaintiffs contend that the Forest Service lacked a reasonable basis for concluding that there was no potential for continued grazing in these allotments to significantly impact the "outstandingly remarkable values" for which the river was designated, given the evidence of poor water quality in these allotments and the lack of fisheries monitoring data.[28] The Forest Service's decision

---

[28] The Umatilla Forest Plan states that these outstandingly remarkable values may include "anadromous fisheries, wildlife, aesthetic, scenic, historic, archeologic, scientific, and other features." UPOL3352.

memos for these two allotments failed to even address whether continued grazing could impact

the designated North Fork John Day Wild and Scenic River, observing that each allotment "does

not contain any Congressionally designated wilderness, wilderness study areas, or National

Recreation Areas[]."[29]  CD933, TB1319.

The Forest Service notes that in allotment recreation reports, it concluded that effects of

grazing on the Wild and Scenic River corridor would be "short-lived" and "very few" because

steep terrain near the river deters most grazing and "small number of livestock" that do reach

areas of steelhead spawning habitat will be removed within two weeks.  CD 891, TB1198.  This

explanation cannot satisfy the Forest Service's duty to explain why continued grazing would

have no possibly significant effect on the Wild and Scenic River since it does not even

acknowledge which values associated with the river Congress found to be "outstandingly

remarkable," let alone address the potential impact of grazing on each of those values.  *See* 16

U.S.C. § 1281(a) ("Each component of the national wild and scenic rivers system shall be

administered in such manner as to protect and enhance *the values which caused it to be included*

*in said system*") (emphasis added).   Accordingly, the Forest Service was arbitrary and capricious

in determining that Central Desolation and Texas Bar CEs complied with the Forest Service's

extraordinary circumstances policy.

### 5. Birch Creek Research Natural Area/Wetland– Lucky Strike and Klondike Allotment CEs

---

[29] The Forest Service apparently read its own extraordinary circumstances policy
extremely narrowly, limiting the scope of Congressional designated areas only to those
specifically listed – wilderness, wilderness study areas, or National Recreation Areas – and
ignoring that the policy clearly provides these as examples rather than an exhaustive listing of all
types of Congressionally designated areas.

Page 73- FINDINGS AND RECOMMENDATION

The Lucky Strike and Klondike allotments encompass the proposed 410-acre Birch Creek Cove Research Natural Area.  LS1101, KLD1077.  The Forest Plan requires that livestock be excluded from this type of area, unless they are necessary to establish or maintain a specific vegetation type.  UPOL3406-3407.  Here, the Forest Service conducted a botanical survey in the summer of 2004 as well as a site visit in July 2005, which found little or no use of cattle in the area and indicated that the steep topography and dense understory of downed trees would prevent cattle from accessing the area.  LS068, 1101; KLD1077.  I defer to the Forest Service's technical determination, based on two site visits in consecutive years, that cattle do not access this sensitive area and that the proposed Research Natural Area is not an extraordinary circumstance triggering full NEPA analysis.

## CONCLUSION

For the reasons stated above, the plaintiffs motion for summary judgment (#83), the Forest Service's motion for summary judgment (#107), and the intervenors' motion for summary judgment (#103) should all be granted in part and denied in part.  All evidentiary objections not specifically addressed herein are denied as moot.  The chart on the following pages summarizes this court's analysis of the challenged decisions' compliance with the rider, indicating that the Forest Service was arbitrary and capricious in relying on a categorical exclusion for all allotments except Thompson Flat.

//

//

//

//

Page 74- FINDINGS AND RECOMMENDATION

| Decision Memo | Rider Prong Two | Rider Prong Three |
|---|---|---|
| **\*** *Italics* indicates Forest Service explanation determined to be arbitrary and capricious | | |
| Upper Imnaha CE- Blackmore, College Creek, Dunn Creek, Grizzly Ridge, Keeler | -Rangeland<br>-*Unique Species, Habitats, Ecosystems*<br>    *Soil Crusts*<br>    *Seeps, Springs, Wetlands*<br>-Riparian | -*HCNRA*<br>-Federally Designated Critical Habitat for Listed and Threatened Fish<br>-*Seeps, Springs, Wetlands*<br>-*Sensitive Plants* (Grizzly Ridge only) |
| Upper Imnaha CE- Chalk Creek, Dunlap-Thorn, Snell Creek | -Rangeland<br>-*Unique Species, Habitats, Ecosystems*<br>    *Soil Crusts*<br>    *Seeps, Springs, Wetlands*<br>-Riparian | -*HCNRA*<br>-Federally Designated Critical Habitat for Listed and Threatened Fish<br>-*Seeps, Springs, Wetlands*<br>-Sensitive Plants |
| North Fork Burnt River CE- Alder Springs, China Creek, Snow Creek | -Rangeland<br>-*Riparian* | -*Sensitive redband trout*<br>-*Sensitive Columbia spotted frog*<br>-*Sensitive Botrychium* |
| Hardman CE | -Rangeland<br>-Riparian | -*Federally Designated Critical Habitat for listed fish, Threatened steelhead, and Sensitive redband trout*<br>-Sensitive Columbia spotted frog |
| Little Wall CE | -Riparian | -*Federally Designated Critical Habitat for listed fish, Threatened steelhead, and Sensitive redband trout*<br>-Sensitive Columbia spotted frog |
| Monument CE | -Riparian | -*Federally Designated Critical Habitat for listed fish, Threatened steelhead, and Sensitive redband trout*<br>-Sensitive Columbia spotted frog |
| Tamarck CE | -Riparian | -*Federally Designated Critical Habitat for listed fish, Threatened steelhead, and Sensitive redband trout*<br>-Sensitive Columbia spotted frog |
| Yellow Jacket CE | -Riparian | -*Federally Designated Critical Habitat for listed fish, Threatened steelhead, and Sensitive redband trout*<br>-Sensitive Columbia spotted frog |
| Collins Butte CE | -Riparian | -*Federally Designated Critical Habitat for listed fish, Threatened steelhead, and Sensitive redband trout*<br>-Sensitive Columbia spotted frog |

Page 75- FINDINGS AND RECOMMENDATION

| Ditch Creek CE | -Riparian | *-Federally Designated Critical Habitat for listed fish, Threatened steelhead, and Sensitive redband trout* <br> -Sensitive Columbia spotted frog |
|---|---|---|
| Lucky Strike CE | **-Riparian** | *-Federally Designated Critical Habitat for listed fish, Threatened steelhead, and Sensitive redband trout* <br> *-Sensitive Columbia spotted frog* <br> -Birch Creek research Natural Area |
| Klondike CE | -Riparian | *-Federally Designated Critical Habitat for listed fish, Threatened steelhead, and Sensitive redband trout* <br> -Sensitive Columbia spotted frog <br> -Birch Creek research Natural Area |
| Matlock CE | -Rangeland <br> *-Riparian* | *-Federally Designated Critical Habitat for listed fish, Threatened steelhead, and Sensitive redband trout* <br> -Sensitive Columbia spotted frog |
| Thompson Flat CE | -Rangeland <br> -Riparian | -Federally Designated Critical Habitat for listed fish, Threatened steelhead, and Sensitive redband trout <br> -Sensitive Columbia spotted frog |
| Central Desolation CE | **-Riparian** | -Federally Designated Critical Habitat for listed fish, Threatened steelhead, and Sensitive redband trout <br> -Sensitive Columbia spotted frog <br> *-Congressionally Designated North Fork John Day Wild and Scenic River* |
| Texas Bar CE | **-Riparian** | -Federally Designated Critical Habitat for listed fish, Threatened steelhead, and Sensitive redband trout <br> -Sensitive Columbia spotted frog <br> *-Congressionally Designated North Fork John Day Wild and Scenic River* |

//

//

//

//

//

//

Page 76- FINDINGS AND RECOMMENDATION

**SCHEDULING ORDER**

The Findings and Recommendation will be referred to a district judge.  Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

IT IS SO ORDERED.


Dated this 10th day of August, 2012.


　　　　　　　　　　　　　 /s/ Paul Papak
　　　　　　　　　　　　　Honorable Paul Papak
　　　　　　　　　　　　　United States Magistrate Judge




Page 77- FINDINGS AND RECOMMENDATION