IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

**HELLS CANYON PRESERVATION COUNCIL and OREGON NATURAL DESERT ASSOCIATION,**

        Plaintiffs,

      v.

**KENT CONNAUGHTON, Regional Forester, Region 6, and U.S. FOREST SERVICE,**

        Defendants,

**PAT and ANNA SULLIVAN et al.,**

        Defendant-Intervenors.

No. 3:11-cv-00023-PK

AMENDED OPINION AND ORDER

**MOSMAN, J.**,

At issue in this matter are livestock grazing rights in the Wallowa-Whitman and Umatilla National Forests. Plaintiffs Hells Canyon Preservation Council and Oregon Natural Desert Association challenge the Forest Service's alleged practice of renewing livestock grazing permits on federal land without conducting the proper environmental review under the National Environmental Policy Act ("NEPA").

1 – AMENDED OPINION AND ORDER

After reviewing the extensive record and hearing oral argument, Judge Papak issued his Findings and Recommendation [149] on the parties' cross-motions for summary judgment [83, 103, 107], including his finding that all but one of the permit renewals were arbitrary and capricious. All of the parties have filed objections [151, 152, 153] to the F&R, and plaintiffs have filed a response [154] to defendants' objections. I now ADOPT the F&R as modified below.

## STATUTORY AND REGULATORY BACKGROUND

### I.  The National Forest Management Act

The National Forest Management Act outlines the duties and obligations of the Forest Service in managing the national forests. *See* 16 U.S.C. §§ 1600–1614. The NFMA and its implementing regulations subject forest management to two stages of administrative decision making. At the first stage, the Forest Service is required to develop a Land and Resource Management Plan ("LRMP" or "Forest Plan"), which sets forth a broad, long-term planning document for an entire national forest. At the second stage, the Forest Service must approve or deny individual, site-specific projects. These individual projects must be consistent with the Forest Plan. *Inland Empire Pub. Lands Council v. U.S. Forest Serv.*, 88 F.3d 754, 757 (9th Cir. 1996).

There are two Forest Plans at issue here: the Wallowa-Whitman National Forest Plan and the Umatilla National Forest Plan. WPOL 1405–1819; UPOL 3166–3578.[1] Both Forest Plans were amended by PACFISH and INFISH Riparian Management Objectives in 1995. WPOL 2735; UPOL 4306. In addition, part of the Wallowa-Whitman National Forest is subject to the

---

[1] Citations in this format refer to portions of the revised administrative record [111]. The administrative record is divided by national forest and allotment, and the record itself employs capital letter prefixes to uniquely identify subsets of the record. For example, the "WPOL" prefix identifies documents pertaining to the Wallowa-Whitman National Forest policy.

Hells Canyon National Recreation Area Comprehensive Management Plan ("CMP"). WPOL 4008–5800.

## II.     The National Environmental Policy Act

The National Environmental Policy Act ("NEPA") "is a procedural statute that does not 'mandate particular results, but simply provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions.'" *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 639 (9th Cir. 2004) (quoting *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1070 (9th Cir. 2002). Regulations promulgated by the Council on Environmental Quality ("CEQ") provide guidance on the implementation of NEPA. 40 C.F.R. §§ 1500–08. These regulations allow an agency to comply with NEPA in one of three ways. First, the agency may prepare an environmental impact statement ("EIS"). *See* 40 C.F.R. § 1502. Second, the agency may prepare an environmental assessment ("EA") to determine whether the environmental impact of the proposed action is sufficiently significant to warrant an EIS. *See* 40 C.F.R. §§ 1501.4(b), 1508.9. Third, the agency may determine that the proposed action falls within an established categorical exclusion ("CE"). *See* 40 C.F.R. § 1508.4.

The CEQ regulations authorize an agency to use a CE for "actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in [NEPA] procedures adopted by a Federal agency." 40 C.F.R. § 1508.4. There are circumstances in which the application of a CE is inappropriate, however. The agency "shall provide for extraordinary circumstances in which [the] normally excluded action may have a significant environmental effect." *Id*. Therefore, prior to applying a CE in a particular instance, an agency must determine that none of the extraordinary

circumstances exists. The process through which the agency determines whether the application of the CE is appropriate is called "the scoping process."

### III.     The 2005 Appropriations Rider

Based on a concern that the Forest Service's inability to complete NEPA analyses on many expiring grazing permits would unfairly delay the renewal of those permits, Congress passed the Rescission Act of 1995. *See* Pub. L. No. 104–19 §§ 501–04, 109 Stat. 194 (1995); *WildEarth Guardians v. U.S. Forest Serv.*, 668 F. Supp. 2d 1314, 1322 (D.N.M. 2009). The Rescission Act failed to resolve the backlog, however, so Congress passed a series of bills attempting to facilitate the renewal process, including Section 339 of the Consolidated Appropriations Act of 2005 ("the Rider"), the provision at issue in this case. Pub. L. No. 108–447 § 339, 118 Stat. 2809, 3103 (2004). The Rider authorized the Forest Service to categorically exclude certain grazing permit renewals in fiscal years 2005–2007, provided three conditions were met:

> (1) the decision continues current grazing management of the allotment;
> (2) monitoring indicates that current grazing management is meeting, or satisfactorily moving toward, objectives in the land and resource management plan; and
> (3) the decision is consistent with agency policy concerning extraordinary circumstances.

*Id*. As with other CEs, if the renewal of a grazing permit satisfied the three conditions listed above, the Forest Service was not required to do an EA or EIS under NEPA. Congress later extended the Rider for fiscal year 2008, adding the further limitation that the Forest Service could not apply this CE to any allotment contained within a federally designated wilderness area. Consolidated Appropriations Act of 2008, Pub. L. No. 110–161 § 421 (2008).

4 – AMENDED OPINION AND ORDER

## LEGAL STANDARDS

### I. Magistrate Recommendations

The magistrate judge makes only recommendations to the court, to which any party may file written objections. The court is not bound by the recommendations of the magistrate judge, but retains responsibility for making the final determination. The court is generally required to make a de novo determination regarding those portions of the report or specified findings or recommendation as to which an objection is made. 28 U.S.C. § 636(b)(1)(C). However, the court is not required to review, de novo or under any other standard, the factual or legal conclusions of the magistrate judge as to those portions of the F&R to which no objections are addressed. *See Thomas v. Arn*, 474 U.S. 140, 149 (1985); *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003). While the level of scrutiny under which I am required to review the F&R depends on whether or not objections have been filed, in either case, I am free to accept, reject, or modify any part of the F&R. 28 U.S.C. § 636(b)(1)(C).

### II. Agency Action

The court may set aside a final agency action if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Generally, "review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Rather than evaluating the agency's final decision in isolation, the court must evaluate "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). An agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an

important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs.*, 463 U.S. at 43.

The arbitrary and capricious standard specifically applies to an agency's determination that a particular action falls within a categorical exclusion. *Bicycle Trails Council of Marin v. Babbitt*, 82 F.3d 1445, 1456 (9th Cir. 1996). "When an agency decides to proceed with an action in the absence of an EA or EIS, the agency must adequately explain its decision." *Alaska Ctr. For Env't v. U.S. Forest Serv.*, 189 F.3d 851, 859 (9th Cir. 1999). Once the agency considers the proper factors and makes a decision as to whether a particular action falls within a CE, however, "that decision implicates substantial agency expertise and is entitled to deference." *Id.*

### III.    Agency Interpretations

Under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, a court must adopt an agency's interpretation of a statute it administers if Congress has not directly spoken "to the precise question at issue" and if the "agency's answer is based on a permissible construction of the statute." 467 U.S. 837, 842–43 (1984). But not every agency interpretation is entitled to *Chevron* deference. Rather, the court applies *Chevron* deference only when (1) "it appears that Congress delegated authority to the agency generally to make rules carrying the force of law," and (2) "the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001).

By contrast, agency interpretations that lack the force of law do not warrant *Chevron* deference. *Christensen v. Harris County*, 529 U.S. 576, 587 (2000). "Such views, however, even if not authoritative for purposes of *Chevron*, are entitled to so-called *Skidmore* deference insofar as they 'constitute a body of experience and informed judgment to which courts and litigants

6 – AMENDED OPINION AND ORDER

may properly resort for guidance.'" *Vigil v. Leavitt*, 381 F.3d 826, 835 (9th Cir. 2004) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

A theoretically distinct form of deference applies to an agency's interpretation of its own ambiguous regulations. Under so-called *Auer* deference, such an interpretation is "controlling unless plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (internal quotation marks and citation omitted).

## DISCUSSION

Plaintiffs challenge CE renewals on twenty-four allotments, eleven in the Wallowa-Whitman National Forest and thirteen in the Umatilla National Forest. These challenges are based on the Forest Service's alleged failure to satisfy the Rider's second and third prongs. Judge Papak found that renewing the permits on all but one of these allotments violated the terms of the Rider. Each side now raises four objections to Judge Papak's findings. Three of plaintiffs' four objections are based on typos in the F&R's summary table and are therefore sustained. Plaintiffs' fourth objection and all four of defendants' objections basically turn on two issues: (1) whether the F&R appropriately deferred to the agency's choice of monitoring methods under the Rider's second prong, and (2) whether the Forest Service was required to conduct a separate cumulative impacts analysis when applying an already established CE under the Rider's third prong. I will address these two overarching issues below.

### I.     Prong Two: Progress Toward Plan Objectives

The Rider's second prong requires monitoring to show that current grazing management is meeting or satisfactorily moving toward objectives in the relevant land and resource management plans. The F&R suggests that when the Forest Service uses a qualitative proxy method to monitor an inherently quantitative objective, the record must include empirical

7 – AMENDED OPINION AND ORDER

evidence to support its reliability, particularly where, as here, significant data shows that some objectives are not met and trends are largely static. (F&R [149] at 9–10, 60–64.) The Forest Service objects to this empirical evidence requirement as it applies to the monitoring methods it used to show progress toward Riparian Management Objectives on the Lucky Strike and Matlock allotments. Instead, the Forest Service argues that its mix of monitoring methods need only be reasonable. At oral argument, plaintiffs conceded this point but countered that the Forest Service had failed to provide any reasoned basis for the mix of monitoring methods it selected. Therefore, the principal dispute between the parties here is whether the Forest Service in fact articulated a reasoned basis for the particular mix of monitoring methods it used to show progress toward Riparian Management Objectives on the Lucky Strike and Matlock allotments.

On these two allotments, the Forest Service relied on a mix of field exams, photo points, stubble height monitoring, and exclusion fencing to show progress toward Riparian Management Objectives. Although I agree with Judge Papak that the Forest Service provided precious little reasoning behind its decision to use these methods—in contrast to descriptions of the methods themselves, of which there are many—I nonetheless conclude that the Forest Service has met its burden. In the Matlock decision memo, for example, the Forest Service stated that it employed monitoring methods that had proven effective on the North Fork John Day Ranger District. MAT 563. In addition, the Forest Service explained that these methods were supported by the Forest Plan, past monitoring, permit administration, and long-term monitoring data. *Id*. Similarly, in the Lucky Strike decision memo, the Forest Service stated that it employed monitoring methods that had been deemed appropriate by the 1999 North Fork John Day Multi-species Biological Assessment and the 2003 NOAA Letter of Concurrence. It is not the proper role for federal courts "to act as a panel of scientists" that instructs the Forest Service how to monitor progress

8 – AMENDED OPINION AND ORDER

toward its own Forest Plan objectives. *Lands Council v. McNair*, 537 F.3d 981, 988 (9th Cir. 2008) (en banc). In my view, a decision expressly based on the previously mentioned factors is sufficient.

In addition to the general objection to the empirical evidence requirement, the Forest Service specifically objects to Judge Papak's finding that it acted arbitrarily and capriciously in relying on exclusion fencing to determine that grazing was moving toward Riparian Management Objectives. I agree that such reliance was neither arbitrary nor capricious. Scientific literature has rated exclusion fencing as "good" to "excellent" in preventing grazing impacts and improving the health of riparian areas. *See* UPOL 3863. Furthermore, the National Marine Fisheries Service recommended continued exclusion fencing, noting that "[n]umerous studies have found that excluding livestock from riparian areas can lead to rapid recovery of degraded riparian conditions and/or protect properly functioning riparian communities." UPOL 6871; *see also* UPOL 6867–68. I recognize that exclusion fencing is less a monitoring method than a means of improving riparian conditions. But even though it might serve a monitoring purpose only indirectly, I find that there is substantial justification for the Forest Service's reliance on it in combination with other monitoring methods to show progress toward Riparian Management Objectives. As a result, I conclude that the Forest Service's reliance in part on exclusion fencing to show progress toward Riparian Management Objectives was reasonable on the following allotments: Hardman, Little Wall, Monument, Monument, Tamarack, Ditch Creek, Lucky Strike, Klondike, and Matlock.

By extension, this conclusion affects my Prong Three analysis. Judge Papak found that the Forest Service acted arbitrarily and capriciously in relying on exclusion fencing to determine that grazing was moving toward Riparian Management Objectives. Based on that finding, he

9 – AMENDED OPINION AND ORDER

reasoned that the Forest Service lacked adequate evidence to conclude that current grazing would have no significant environmental effect on threatened and sensitive fish and Designated Critical Habitat on the following allotments: Hardman, Little Wall, Monument, Tamarack, Yellow Jacket, Collins Butte, Ditch Creek, Lucky Strike, Klondike, and Matlock. (F&R [149] at 67–69, 70.) For the reasons stated above, I find the Forest Service's reliance on exclusion fencing to be reasonable. Therefore, I believe the Forest Service provided a reasoned basis for its conclusion that current grazing would have no significant environmental effect on threatened and sensitive fish and Designated Critical Habitat on these allotments, except where it failed to consider cumulative impacts.

## II.     Prong Three: Extraordinary Circumstances

The Rider's third prong requires that the Forest Service's "decision [be] consistent with agency policy concerning extraordinary circumstances." Pub. L. No. 108–447 § 339, 118 Stat. 2809, 3103 (2004). The Forest Service argues that this policy is set forth exclusively in the Forest Service Handbook section entitled "Extraordinary Circumstances," which contemplates a two-step analysis. First, the Handbook requires the Forest Service to determine whether certain resource conditions are present in the action area. *See* Forest Service Handbook 1909.15 § 31.2; WPOL 7508–7509. These resource conditions include:

> (1) Federally listed threatened or endangered species or designated critical habitat, species proposed for Federal listing or proposed critical habitat, or Forest Service sensitive species;
> (2) Flood plains, wetlands, or municipal watersheds;
> (3) Congressionally designated areas, such as wilderness, wilderness study areas, or national recreation areas;
> (4) Inventoried roadless areas or potential wilderness areas;
> (5) Research natural areas;
> (6) American Indian and Alaska Native religious or cultural sites, and
> (7) Archeological sites, or historic properties or areas.

*Id.*; 36 C.F.R. § 220.6(b). Second, if any of these resource conditions are present, the Forest Service must assess the degree of potential effect of the proposed action on the resource condition. *See id*. If the proposed action may have a significant environmental effect, an EIS should be prepared. *See* 36 C.F.R. § 220.6(c) If, in contrast, the Forest Service is uncertain whether the proposed action may have a significant effect, an EA should be prepared. *See id*. Thus, only where the potential effect on the resource condition is known to be insignificant does the action comply with the Forest Service's policy on extraordinary circumstances. And, therefore, only where the potential effect is known to be insignificant may the Forest Service apply a CE.

The principal dispute between the parties here is whether the Forest Service was required to conduct a separate cumulative impacts analysis when applying an already established CE under the Rider. The Forest Service emphasizes that the words "cumulative impacts" appear neither in this section of the Handbook nor in the Forest Service's checklist for determining whether a permit renewal is consistent with agency policy on extraordinary circumstances. *See* 36 C.F.R. § 220.6(b); WPOL 5842–43. Consequently, in the Forest Service's view, it need not conduct a cumulative impacts analysis each time it grants a permit renewal under the Rider.

In response, plaintiffs contend that the Handbook section on scoping, which does require cumulative impacts analysis, is also part of the Forest Service's policy on extraordinary circumstances. *See* Forest Service Handbook 1909.15 § 31.3. According to plaintiffs, then, cumulative impacts analysis is part of the Forest Service's policy on extraordinary circumstances and is therefore required each time the Forest Service grants a permit renewal under the Rider.

On one level, the Forest Service's argument is persuasive. The Rider is ambiguous on its face: It requires compliance with agency policy on extraordinary circumstances but leaves the

11 – AMENDED OPINION AND ORDER

contours of that policy to the agency's definition. Although the Forest Service's interpretation of its own policy on extraordinary circumstances seems narrow, it is certainly entitled to a degree of deference.[2] And it appears to be a non-arbitrary, reasonable interpretation of the Rider that Congress intended to require compliance with only the "Extraordinary Circumstances" section of the Handbook. Indeed, when analyzing this same prong of the Rider, at least one other district court has found that the Forest Service's interpretation of its policy is entitled to substantial deference. *See WildEarth Guardians v. U.S. Forest Serv.*, 668 F.Supp.2d 1314, 1329–31 (D.N.M. 2009).

Pushing onward, however, there are major obstacles in the path the Forest Service asks me to take. First and foremost, the text of the CEQ regulations requires cumulative effects analysis. Section 1508.4, which provides guidance on the use of CEs, defines a CE as "a category of actions which do not individually or cumulatively have a significant effect on the human environment . . . ." 40 C.F.R. § 1508.4. This section also requires the agency to "provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect." *Id*. The key word in this last sentence is "significant." Under § 1508.27(b)(7), which defines the word "significant" for NEPA purposes, a determination of significance requires the agency to consider "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts." Therefore, in order to provide for extraordinary circumstances under § 1508.4, the agency must consider cumulative impacts.

According to the Forest Service, however, even if the CEQ regulations do require cumulative impacts analysis, Congress proscribed a different process in adopting the Rider.

---

[2] Unlike most Forest Service CEs, the CE at issue here was promulgated directly by Congress in the Rider. Moreover, it does not appear that Congress delegated authority to the Forest Service to make rules carrying the force of law. Therefore, the Forest Service's interpretation of the Rider is entitled to only *Skidmore* deference. *See Christensen*, 529 U.S. at 587.

12 – AMENDED OPINION AND ORDER

Based on the plain language, the argument goes, Congress did not intend for cumulative impacts analysis to be part of the equation. The Rider does not reference the CEQ regulations. Instead, the Rider adopts only the requirement that the decision be consistent with the agency's policy on extraordinary circumstances. Pub. L. No. 108–447 § 339, 118 Stat. 2809, 3103 (2004). As a result of this chain of reasoning, the Forest Service argues that I should limit my review to that policy as the Forest Service defines it.

I am not persuaded. It does appear that Congress's intent with the Rider was to accelerate approval of grazing permits through CEs. But this goal of streamlining the NEPA review process through CEs was not unique to the Rider. *See, e.g., Alaska Ctr.*, 189 F.3d at 857 (noting that CEQ regulations direct the agencies to identify CEs to facilitate review under NEPA). Against this pre-existing regulatory framework, Congress employed terms of art with well-defined meanings. For example, Congress "categorically excluded" a class of actions as long as three requirements were satisfied, including the requirement of consistency with agency policy on "extraordinary circumstances." *Id*. Absent any textual support to the contrary, I conclude that Congress intended to adopt the pre-existing regulatory framework, which, as described above, requires the Forest Service to consider cumulative impacts as part of its policy on extraordinary circumstances.

Ninth Circuit precedent reinforces this conclusion. In *Alaska Center*, the court applied these CEQ regulations to a site-specific application of a CE. 189 F.3d at 859. In so doing, the court held that the agency must consider several relevant factors, including cumulative impacts, to determine whether an action will significantly impact the environment. *See id*. For this second reason, too, I conclude that the Forest Service must consider cumulative impacts as part of its policy on extraordinary circumstances.

In his F&R, Judge Papak noted that the cumulative impacts analysis required when applying an already established CE is less exhaustive than the cumulative impacts analysis required either in establishing a new CE or conducting an EA or EIS. (F&R [149] at 13–14.) In practice, I agree with that assessment. Section 1508.7 defines cumulative impact as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions . . . ." 40 C.F.R. § 1508.7. There appears to be some variability in cumulative impacts analysis, however. The June 24, 2005, CEQ guidance memorandum states that "[t]he extent and form of the information needed to analyze appropriately the cumulative effects of a proposed action and alternatives under NEPA varies widely and must be determined by the federal agency proposing the action on a case-by-case basis." *Guidance on the Consideration of Past Actions in Cumulative Effects Analysis* at 2, available at http://ceq.hss.doe.gov/nepa/regs/guidance.html. Thus, although there is no categorically different form of cumulative impacts analysis for applying an already established CE, the extent and form of the information needed to properly analyze cumulative impacts will vary on a case-by-case basis.

As discussed at length in the F&R, the Forest Service failed to consider cumulative impacts on the following allotments: Alder Springs, China Creek, Snow Creek, Hardman, Little Wall, Monument, Tamarack, Yellow Jacket, Collins Butte, and Ditch Creek. Because the Forest Service failed to consider cumulative impacts here, I now find these decisions arbitrary and capricious and remand to the agency for further proceedings consistent with this opinion.

# CONCLUSION

For the reasons outlined in the F&R as modified in this opinion, plaintiffs' motion for summary judgment [83], the Forest Service's motion for summary judgment [107], and the intervenors' motion for summary judgment [103] are all GRANTED IN PART and DENIED IN PART. I find the Forest Service's action on the following allotments arbitrary and capricious: Blackmore, College Creek, Dunn Creek, Grizzly Ridge, Keeler, Chalk Creek, Dunlap-Thorn, Snell Creek, Alder Springs, China Creek, Snow Creek, Hardman, Little Wall, Monument, Tamarack, Yellow Jacket, Collins Butte, Ditch Creek, Central Desolation, and Texas Bar. I therefore remand these decisions to the Forest Service for further proceedings consistent with this opinion. If, on remand, the Forest Service decides to proceed with these decisions, it must provide a more complete explanation of its categorical exclusion determinations, including a convincing statement of reasons why potential effects are insignificant.

IT IS SO ORDERED.

DATED this __22nd__ day of February, 2013.

/s/ Michael W. Mosman
MICHAEL W. MOSMAN
United States District Judge